STATE OF MINNESOTA *ex rel.* William J. Hahn, Attorney General,
*vs.* AUSTIN H. YOUNG and others.

September 9, 1881.

**Constitution — Amendment Impairing Obligation of State Railroad
Bonds.**—The amendment to section 2, article 9, of the constitution of
this state, adopted November 6, 1860, providing that "no law levying a
tax or making other provisions for the payment of interest or principal
of the bonds denominated 'Minnesota State Railroad Bonds' shall take
effect or be in force until such law shall have been submitted to a vote of
the people of the state, and adopted by a majority of the electors of the
state voting upon the same," impairs the obligation of the contracts
therein referred to, and is, consequently, repugnant to the clause in the
constitution of the United States that no state shall pass any law impair-
ing the obligation of contracts, and it is therefore void.

**Same—Delegation of Legislative Power.**—The act of the legislature of
this state entitled "An act providing for the adjustment of the Minne-
sota state railroad bonds," approved March 2, 1881, delegates the judges
therein mentioned legislative power,—that is, power, by the decision they
are called on to make, to determine which of two sections, section 4 or
section 5, of the act, shall take effect and be the law,—and it is therefore
void.

By an act approved March 3, 1857, (11 U. S. St. at Large, 195,)
congress granted to the then territory of Minnesota, to aid in the con-
struction of six lines of railroad on routes designated in the act, six
sections of land per mile, in alternate sections, along the lines of
such roads as they should thereafter be located.    By an act approved
May 23, 1857, (Laws 1857, Ex. Sess. *c.* 1,) the territory bestowed
these grants on the Southern Minnesota Railroad Co., the Transit
Railroad Co., the Minneapolis & Cedar Valley Railroad Co., and the
Minnesota & Pacific Railroad Co.    By act of congress of February
23, 1857, (11 U. S. St. at Large, 166,) the people of the territory had
been authorized to form a constitution and state government, with a
view to admission into the Union, and on October 13, 1857, a constitu-
tion was adopted, containing the following provisions, in article 9:

"Sec. 2. The legislature shall provide for an annual tax sufficient to defray the estimated expenses of the state for each year; and whenever it shall happen that such ordinary expenses of the state for any year shall exceed the income of the state for such year, the legislature shall provide for levying a tax for the ensuing year sufficient, with other sources of income, to pay the deficiency of the preceding year, together with the estimated expenses of such ensuing year.".

"Sec. 10. The credit of the state shall never be given or loaned in aid of any individual, association or corporation."

The financial depression occurring in the autumn of 1857 made it impossible for the land-grant companies to obtain money to build their roads, and on March 9, 1858, the first legislature elected under the constitution, passed an act proposing an amendment to section 10 of article 9 of the constitution, which was submitted to the people on April 15, 1858, and adopted, the vote being 25,023 in favor of, and 6,733 against, the proposed amendment. As thus amended, this section read as follows:

"Sec. 10. The credit of this state shall never be given or loaned in aid of any individual, association or corporation, except that for the purpose of expediting the construction of the lines of railroads, in aid of which the congress of the United States has granted lands to the territory of Minnesota, the governor shall cause to be issued and delivered to each of the companies in which said grants are vested by the legislative assembly of Minnesota, the special bonds of the state, bearing an interest of seven per cent. per annum, payable semi-annually in the city of New York, as a loan of public credit, to an amount not exceeding twelve hundred and fifty thousand dollars, or an aggregate amount to all of said companies not exceeding five millions of dollars, in manner following, to-wit:

"Whenever either of the said companies shall produce to the governor satisfactory evidence, verified by the affidavits of the chief engineer treasurer and two directors of said company, that any ten miles of the road of said company has been actually constructed and completed, ready for placing the superstructure thereon, the governor shall cause to be issued and delivered to such company, bonds to

the amount of one hundred thousand dollars; and, whenever thereafter, and as often as either of said companies shall produce to the governor, like evidence of a further construction of ten miles of its road, as aforesaid, then the governor shall cause to be issued to such company further like bonds to the amount of one hundred thousand dollars for each and every ten miles of road thus constructed; and whenever such company shall furnish like evidence that any ten miles of its road is actually completed and cars running thereon, the governor shall cause to be issued to such company like bonds to the amount of one hundred thousand dollars; and whenever thereafter, and as often as either of said companies shall produce to the governor like evidence that any further ten miles of said road is in operation as aforesaid, the governor shall cause to be issued to such company further like bonds to the amount of one hundred thousand dollars until the full amount of the bonds hereby authorized shall be issued: *provided*, that two-fifths, and no more, of all bonds issued to the Southern Minnesota railroad company, shall be expended in the construction and equipment of the line of road from La Crescent to the point of junction with the Transit Road, as provided by law: *and further provided*, that the Minneapolis and Cedar Valley railroad company shall commence the construction of their road at Faribault and Minneapolis, and shall grade an equal number of miles from each of said places.

"The said bonds thus issued shall be denominated 'Minnesota State Railroad Bonds,' and the faith and credit of this state are hereby pledged for the payment of the interest and the redemption of the principal thereof. They shall be signed by the governor, countersigned and registered by the treasurer, sealed with the seal of the state, of denominations not exceeding one thousand dollars, payable to the order of the company to whom issued, transferable by the endorsement of the president of the said company, and redeemable at any time after ten and before the expiration of twenty-five years from the date thereof. Within thirty days after the governor shall proclaim that the people have voted for a loan of state credit to railroads, any of said companies proposing to avail themselves of the loan herein provided for, and to accept the conditions of the same,

shall notify the governor thereof, and shall, within sixty days, commence the construction of their roads, and shall, within two years thereafter, construct, ready for the superstructure, at least fifty (50) miles of their road. Each company shall make provision for the punctual payment and redemption of all bonds issued and delivered as aforesaid to said company, and for the punctual payment of the interest which shall accrue thereon, in such manner as to exonerate the treasury of this state from any advances of money for that purpose; and, as security therefor, the governor shall demand and receive from each of said companies, before any of said bonds are issued, an instrument pledging the net profits of its road, for the payment of said interest, and a conveyance to the state of the first two hundred and forty sections of land, free from prior encumbrances, which such company is or may be authorized to sell, in trust for the better security of the treasury of the state from loss on said bonds, which said deed of trust shall authorize the governor and secretary of state to make conveyances of title to all or any of such lands to purchasers agreeing with the respective railroad companies therefor. *Provided,* that before releasing the interest of the state to such lands, such sale shall be approved by the governor, but the proceeds of all such sales shall be applied to the payment of interest accruing upon the bonds in case of default of the payment of the same, and as a sinking fund to meet any future default in the payment of interest and the principal thereof when due; and, as further security, an amount of first mortgage bonds on the roads, lands and franchises of the respective companies, corresponding to the state bonds issued, shall be transferred to the treasurer of the state at the time of the issue of state bonds; and in case either of said companies shall make default in payment of either the interest or principal of the bonds issued to said companies by the governor, no more state bonds shall thereafter be issued to said company, and the governor shall proceed in such manner as may be prescribed by law, to sell the bonds of the defaulting company or companies, or the lands held in trust as above, or may require a foreclosure of the mortgage executed to secure the same: *provided,* that if any company so in default, before the day of sale, shall pay all interest and principal then due, and all expenses incurred

by the state, no sale shall take place, and the right of said company shall not be impaired to a further loan of state credit: *provided*, if any of said companies shall at any time offer to pay the principal, together with the interest that may then be due, upon any of the Minnesota state railroad bonds which may have been issued under the provisions of this section, then the treasurer of state shall receive the same; and the liabilities of said company or companies in respect to said bonds shall cease upon such payment into the state treasury of principal, together with the interest as aforesaid: *provided further*, that in consideration of the loan of state credit herein provided, that the company or companies which may accept the bonds of the state in the manner herein specified, shall, as a condition thereof, each complete not less than fifty miles of its road on or before the expiration of the year 1861, and not less than one hundred miles before the year 1864, and complete four-fifths of the entire length of its road before the year 1866; and any failure on the part of any such company to complete the number of miles of its road or roads, in the manner and within the several times herein prescribed, shall forfeit to the state all the right, title and interest of any kind whatsoever in and to any lands, together with the franchises connected with the same not pertaining or applicable to the portion of the road by them constructed, and a fee-simple to which has not accrued to either of said companies by reason of such construction, which was granted to the company or companies thus failing to comply with the provisions hereof, by act of the legislature of the territory of Minnesota, vesting said land in said companies respectively."

In this case no question is made upon the validity of this amendment, or of the bonds issued under it. They are, however, brought in question in the next following case of *State* v. *Kittelson*, where their validity is sustained.

The companies proceeded to grade portions of their roads, but no part of them was completed, and the work was abandoned after bonds to the amount of about $2,275,000 had been issued by the state to the companies.

Before receiving the bonds, the companies executed mortgages or trust deeds covering all their property and franchises, and securing

bonds issued thereunder, including as well bonds to be delivered to the state as other bonds intended to be negotiated. The governor of the state insisted that the bonds to the state should have priority of lien over any other bonds to be issued by the companies. The companies denied that the state was entitled to any preference as to those securities. In a proceeding in the supreme court to compel the governor, by *mandamus,* to deliver state bonds, the position taken by the companies was sustained by a divided court. *Minnesota & Pacific R. Co.* v. *Sibley,* 2 Minn. 1, (13.)

By the terms of the several trust deeds it was made the duty of the trustees named therein, in case of default in payment of interest upon the bonds deposited with the state, to foreclose the trust deed and sell the property included therein, upon request of the governor of the state; and in case the trustees, upon such request, should fail or refuse to make such sale, then the governor, as agent of the state, was authorized to make a foreclosure and sale, and to make in the name of the company a deed of conveyance of all the franchises, property, etc., of the company.

In 1859, all the companies made default in payment of the interest on the bonds secured by the trust deeds, and the governor demanded of the trustees that they foreclose and sell; but the trustees in every case, (except that of the Minneapolis & Cedar Valley Company,) did not comply with the demand. Thereupon the legislature on March 6, 1860, passed an act (Laws 1860, c. 82,) making it the duty of the governor to foreclose, and authorizing him to purchase, at the sale, the property, rights and franchises embraced in the trust deeds. Pursuant to this act and the terms of the trust deeds, the governor caused the property and franchises of the Minnesota & Pacific Company, and of the Transit Company, to be sold at public auction on June 23, 1860, and those of the Southern Minnesota Company, on October 16, 1860. Those of the Minneapolis & Cedar Valley Company were sold in like manner by the trustees named in its trust deed, on October 16, 1860. At each of those sales the state was the purchaser at the nominal price of $1,000, and soon afterward received deeds of conveyance in the name and on behalf of the several companies, as provided in the trust deeds.

The same legislature, on March 10, 1860, proposed amendments to sections 2 and 10 of article 9, of the constitution. These amendments were submitted to the people on November 6, 1860. The amendment to section 2 was adopted by a vote of 18,648 to 743; that to section 10, by a vote of 19,308 to 710. The sections as amended read as follows, the amendments consisting of the words in brackets:

"Sec. 2. The legislature shall provide for an annual tax sufficient to defray the estimated [ordinary] expenses of the state for each year; and whenever it shall happen that such ordinary expenses of the state for any year shall exceed the income of the state for such year, the legislature shall provide for levying a tax for the ensuing year sufficient, with other sources of income, to pay the deficiency of the preceding year, together with the estimated expenses of such ensuing year.

[But no law levying a tax, or making other provisions for the payment of interest or principal of the bonds denominated 'Minnesota State Railroad Bonds,' shall take effect or be in force until such law shall have been submitted to a vote of the people of the state, and adopted by a majority of the electors of the state voting upon the same.]"

"Sec. 10. The credit of the state shall never be given or loaned in aid of any individual, association or corporation: [Nor shall there be any further issue of bonds denominated 'Minnesota State Railroad Bonds,' under what purports to be an amendment to section ten (10) of article nine (9) of the constitution, adopted April fifteenth, eighteen hundred and fifty-eight, which is hereby expunged from the constitution, saving, excepting and reserving to the state, nevertheless, all rights, remedies and forfeitures accruing under said amendment.]"

In 1862, and 1864, the state regranted to new companies the property, rights and franchises of the original companies. Those of the Minnesota & Pacific Company were granted to the St. Paul & Pacific Railroad Co.; those of the Transit Company to the Winona & St. Peter Railroad Co.; those of the Minneapolis & Cedar Valley Company to the Minnesota Central Railroad Co.; and those of the Southern Minnesota Company were divided between the Minnesota Valley Railroad Co., and a new Southern Minnesota Railroad Co.

In *Huff* v. *Winona & St. Peter R. Co.*, 11 Minn. 115, (180;) *Hilbert* v. *Winona & St. Peter R. Co.*, Id. 163, (246;) and *Fitz* v. *Minn. Central R. Co.*, Id. 304, (414,) it was held that those companies were not the old companies revived, and were not liable for the debts of the old companies. In *First Division, etc., R. Co. v. Parcher*, 14 Minn. 297, it was held that the new companies possessed all the franchises of the old, including (in that case) that of exemption from taxation.

In *Farnsworth* v. *Minn. & Pac. R. Co.*, 92 U. S. 49, an unsuccessful attempt was made by the trustees of the original trust deed of the Minnesota & Pacific Company, to enforce it against the property of the new company; and in *Chamberlain* v. *St. Paul & Sioux City R. Co.*, Id. 299, it was held that plaintiff, a holder of State railroad bonds, originally issued to the Southern Minnesota Company, had no equity to have the lands granted that company, and afterwards regranted to the Minnesota Valley Company, applied to the payment of his bonds, and in those cases the liability of the state upon its railroad bonds, and the invalidity of the amendments of 1860, was incidentally asserted.

From time to time various acts were passed by the legislature and submitted to the people, providing for an adjustment and payment of the indebtedness of the state upon its railroad bonds; (see Laws 1866, *c.* 5; Laws 1867, *c.* 53; Laws 1870, *c.* 13; Laws 1871, *c.* 21;) some of which were rejected by the bondholders, and others by the people. At length, on March 2, 1881, in response to an earnest recommendation by Hon. John S. Pillsbury, then governor of the state, the legislature passed an act, entitled "An act providing for the adjustment of the Minnesota state railroad bonds." Laws 1881, *c.* 102. The preamble recites: "*Whereas*, there has for a long time existed, and still remain outstanding, certain controverted claims against the state, commonly known as the Minnesota state railroad bonds, and certain other claims more particularly referred to and set forth in chapter 152 of the special laws of the year 1867, the validity of all which claims has ever been and still is disputed by the people of this state; *and whereas*, certain holders of said disputed claims, among whom is Selah Chamberlain, have recently made propositions for the compromise and settlement of certain of

v.29—31

the said claims held by them, which propositions are now pending, and the substance of which propositions is embraced within the provisions hereinafter contained; *and whereas*, it is considered to be desirable, and for the best interests of the state and of all the people thereof, that such propositions should be treated with fairness by the state, to the end that all such controverted claims may, if possible, be compromised, settled, and extinguished."

The act then proceeds: "Section 1. For the purposes of this act the principal of said Minnesota state railroad bonds shall be considered as presently due and payable. Any holder of said bonds who desires to avail himself of the provisions of this act must deposit his bonds and coupons with the state auditor, accompanied by an agreement in writing, obligating himself to accept, in lieu of such bonds and coupons, and in full payment and satisfaction thereof, fifty per cent. of the amount nominally due upon said bonds and coupons, less the deduction hereinafter provided for in this act.

"Sec. 2. The judges of the supreme court are hereby authorized and required to hear, consider and determine the matters herein submitted, and as in this act provided. Said judges shall hear arguments, determine and decide whether the legislature has power to provide for the payment, adjustment or settlement of the liability of the state on said Minnesota state railroad bonds, without submitting the matter to a vote of the electors of the state, notwithstanding the amendment to section 2, article 9, of the constitution of the state, adopted November 6, 1860. They shall convene at the capitol, for the purpose of hearing and determining the matter as in this act provided, on the 22d day of March, 1881, or as soon thereafter as practicable, and shall with all convenient speed file their decision and findings with the clerk of the supreme court, and said clerk shall act as clerk of said tribunal." This section also provides that the judges shall also determine all disputes as to the ownership of any of the bonds deposited with the auditor, and makes it the duty of the attorney general to appear and protect the rights and interest of the state, and authorizes him to employ additional counsel.

Section 3 provides that the state auditor shall lay before the judges the bonds and coupons filed with him, and all papers and claims filed

under this act, to be returned to him when the judges are through with them.

"Sec. 4. As soon as the decision of said tribunal shall be filed with the clerk thereof, it shall be the duty of said clerk to prepare a certified copy thereof, under his hand and the seal of said court, and file the same in the office of the state auditor. If the decision be against the validity of said constitutional amendment, or that the legislature has power to provide for the settlement of said bonds without submission to the people, then it shall be the duty of the governor and auditor of state to cause to be prepared new bonds of the state, which new bonds shall be styled 'Minnesota state railroad adjustment bonds,'" and the terms and denominations of which are minutely provided; and each bondholder is to receive, of such new bonds, an amount equal to 50 per cent. of the amount to be due on January 1, 1884, on the bonds and coupons deposited by him, "less, in the case of bonds issued in payment of Minnesota state railroad bonds issued to the railroad companies out of the construction of whose road the claims specified in section 7 of this act originated, such sums as shall be paid on claims allowed under said section." This section also reserves to the state the option to pay in cash instead of in bonds, and for that purpose authorizes a sale of the bonds to be issued under this act. It also provides that the bondholders, on being paid in bonds or cash, shall release the state from liability on the bonds deposited by him.

"Sec. 5. In case the decision of the tribunal to whom the validity of said constitutional amendment shall be submitted under the provisions of this act shall be in favor of the validity of such amendment, and that the legislature has not power to provide for the adjustment of said bonds without submission to the people, then this act shall be submitted to the electors of the state of Minnesota, at the next general election to be held therein after the filing of such decision; and within 60 days after said election, if said act shall be adopted by a majority of said electors present and voting thereon, the same proceedings shall be had for the settlement and adjustment of said Minnesota state railroad bonds as hereinbefore provided for in the case

of a decision by the court holding such amendment invalid," with a provision fixing the form of the ballots to be used.

Section 6 provides for the payment of 50 per cent. on certain judgments, to be made when settlement of the railroad bonds is made under the provisions of this act.

Section 7 provides for proof to be made of unpaid claims for labor or supplies furnished and used in the construction of any part of the lines of any of the land-grant companies which received state railroad bonds from the state, and for a determination of the validity of such claims by the said tribunal; and the holders of such claims as are thus established are to be paid 50 per cent. of the amount thereof, when settlement is made with the bondholders under the provisions of the act; and the sum so paid on such claims "shall be apportioned among and deducted from the amount of the Minnesota state railroad adjustment bonds to be issued under this act in settlement of Minnesota state railroad bonds delivered to and negotiated by the railroad companies that should have paid said claims, and in the construction of whose roads said claims originated," provided the amount to be paid on the claims provided for in this section shall not exceed $150,000, and shall be received by each claimant in full settlement of all demands against the state on account of such claim.

"Sec. 8. In case of the disqualification of any such judges, or their declination for any reason specially applicable to said court or the judges thereof, the governor may and shall make up said tribunal by appointment, in the place of any judge so disqualified or declining to serve, of one of the district judges of this state; and such tribunal, so constituted, shall proceed in all respects as provided herein; and all provisions herein applicable to the judges of the supreme court shall be applicable to the district judges so appointed; and the clerk of the supreme court shall act as clerk of said tribunal, and the decision of said tribunal shall be filed with him, and he shall make and certify a copy of their decision, and file the same in the office of the state auditor, in all respects as herein provided in respect to the decision of the judges of the supreme court; and the same proceedings shall be had, upon the filing of said decision of said district

judges, as herein provided in case of the filing of the decision of the judges of the supreme court, and they shall be entitled to the same compensation."

Sections 9 and 10 provide for the payment of the coupons of the new adjustment bonds out of the annual taxes levied on the gross earnings of the several railroads in the state.

All of the judges of the supreme court having declined to sit in the tribunal created by the act, the following district judges were appointed by the governor to make up the tribunal, as provided in section 8: Austin H. Young of the 4th district, F. M. Crosby of the 1st district, H. R. Brill of the 2d district, John H. Brown of the 12th district, and M. J. Severance of the 6th district. The tribunal thus constituted met at the capitol in St. Paul, on July 26, 1881. The bondholders appeared by their counsel, and the state, by the attorney general and associate counsel, interposed an objection to the jurisdiction and competency of the tribunal; and, immediately afterwards, and before any action taken by the tribunal, its members were served with an order to show cause why a writ of prohibition should not issue from the supreme court, on an information filed therein by D. A. Secombe, Esq., a resident and tax-payer of the city of Minneapolis, and the tribunal thereupon adjourned to await the result of the proceedings in the supreme court. The grounds of the application for the writ, as stated in the relator's affidavit were that the act of March 2, 1881, was unconstitutional, and that the contingency contemplated in section 8 of the act had not arisen, the judges of the supreme court not being disqualified, and not having declined to act for any reasons specially applicable to that court or the judges thereof.

On the return of the order to show cause, the members of the tribunal made answer, and the attorney general, on behalf of the state, was allowed by the court to take charge of and control the proceedings in support of the application, and to amend the information by adding, among others, an averment that the act of March 2, 1881, was unconstitutional because in violation of the amendment of November 6, 1860, to section 2, article 9, above recited, and the matter

was thereupon argued at length by counsel for the state and for the bondholders.

*Wm. J. Hahn,* Attorney General, for the State, (with whom were *D. A. Secombe* and *Daniel Buck.*)

1. The question submitted to the tribunal provided by the act is the validity of the act itself, and not the mere abstract question of the validity of the constitutional amendment of 1860.

2. It is the duty of the legislature itself, in the first instance, to pass on both the expediency and the constitutionality of any act proposed to be passed by it. *Adams* v. *Howe,* 14 Mass. 340; *C. W. & Z. R. Co.* v. *Commissioners,* 1 Ohio St. 77; *State* v. *Parker,* 26 Vt. 357; *Parker* v. *Commonwealth,* 6 Pa. St. 507; 1 Story on Const. § 374; Cooley on Const. Lim. 116, 117, 146.

It was clearly the sworn duty of the legislature to have and to express an opinion on the constitutionality of this law before they enacted it, and it appears from the terms of the act that they either had no opinion on that subject, or else were afraid to express it.

3. This legislative duty cannot be delegated or referred to the people, nor to any portion of the people, nor to any person or body. *Ex parte Wall,* 48 Cal. 279; *Houghton* v. *Austin,* 47 Cal. 646; *Santo* v. *State,* 2 Iowa, 164, 202, 227; *Shumway* v. *Bennett,* 29 Mich. 451, 464; *Parker* v. *Commonwealth,* 6 Pa. St. 507, 515; *C. W. & Z. R. Co.* v. *Commissioners,* 1 Ohio St. 77; *State* v. *Field,* 17 Mo. 529; *Thorne* v. *Cramer,* 15 Barb. 112; *Barto* v. *Himrod,* 8 N. Y. 483: *Slinger* v. *Henneman,* 38 Wis. 504; *Hardenburg* v. *Kidd,* 10 Cal. 402; *Darling* v. *City of St. Paul,* 19 Minn. 389; *Board of Supervisors* v. *Jackson County,* 77 Ill. 59; *Clark* v. *City of Rochester,* 28 N. Y. 605, 632; Cooley on Const. Lim. 116, 117, 146; 1 Dillon on Mun. Corp. §§ 96, 97, 357.

Conditional laws may be passed, it is true, but in all such cases the legislature fully passes on all questions of constitutionality and expediency. The expediency of enacting a given law may depend on facts necessary to be ascertained by some one. The legislature may refer to others the ascertaining of the fact, but the expediency of the law after such facts have been ascertained must be decided by the

legislature itself. But the constitutionality of a proposed law does not depend on any fact. That question must be answered as an entirety by the legislature itself. The power and duty of answering it cannot be delegated. The legislature "cannot substitute the judgment, wisdom and patriotism of others for their own." *Houghton* v. *Austin,* 47 Cal. 646, 653.

4. If it be argued that the legislature did pass upon the constitutionality of the act, but referred this law for approval, and its own decision for review, to this tribunal; or that the question submitted or proposed to be submitted is the validity of the constitutional amendment of November, 1860, then we say that both these questions are purely judicial, and can only be referred to the courts established under and by virtue of the constitution, and not to any other person or body. Const. art. 6, § 1; *Dash* v. *Van Kleeck,* 7 John. 477, 498; *Calhoun* v. *McLendon,* 42 Ga. 405; *Chandler* v. *Nash,* 5 Mich. 409, 417; *Greenough* v. *Greenough,* 11 Pa. St. 489; *Van Slyck* v. *Insurance Co.,* 39 Wis. 390; *Martin* v. *Hunter's Lessees,* 1 Wheat. 304, 327; *Sanborn* v. *Com'rs of Rice Co.,* 9 Minn. 258, (273;) *Forster* v. *Forster,* 129 Mass. 559; *Cohen v. Hoff,* 3 Brevard, (S. C.) 500; *Gough* v. *Dorsey,* 27 Wis. 119, 130; Cooley on Const. Lim. 56, 57, 90–92, 109; Cooley on Const. Law, 43–45; Pomeroy on Const. §§ 137, 140–142, 148; Sedgwick on Stat. 182.

5. If it is claimed that this question is submitted to the members of the commission as judges, and not simply because they are judges, then we say that, unless it is a judicial question, they have no right as judges to entertain or decide it; and, if a judicial question, then it must be submitted in a judicial manner. *People* v. *Town of Nevada,* 6 Cal. 143; *Burgoyne* v. *Supervisors,* 5 Cal. 9, 20; *Dickey* v. *Hurlburt,* Id. 343; *Case of Supervisors of Election,* 114 Mass. 247; *Shumway* v. *Bennett,* 29 Mich. 451, 460–2. Precedents from the action of United States judges are not authority, for the federal constitution does not, like that of this state, explicitly restrain the judges from exercising executive or political functions. If this is not a judicial function, it cannot be exercised by the commission as judges; nor as commissioners, because the constitution does not permit the judges to hold any such office, or to exercise any but judicial func-

tions.  The action here sought is extrajudicial.  It is a case "purely of advice and not of judgment," and the action is the individual and not the judicial action of the judges, and therefore of no binding character.  And, because the members of the commission are judges, the expression of their opinion as commissioners becomes in effect a prejudgment of a question that may come before them, in the courts, for adjudication.

6. If the purpose of the legislature was merely to ask the supreme court judges (or, in case of their refusal, then the district judges) their opinion on the question of the validity of the constitutional amendment of 1860, then we say the legislature had no right to ask any court or the judges thereof their opinion upon any question, nor have the courts or judges any right to give such opinion.  *Reply of the Judges,* 33 Conn. 586; *Application of the Senate,* 10 Minn. 56, (78;) *Rice* v. *Austin,* 19 Minn. 103; *State* v. *Dike,* 20 Minn. 363; *Guilder* v. *Town of Dayton,* 22 Minn. 366.

7. The act is not a legitimate or constitutional exercise of the law-making power.  It is an attempt to exercise judicial power.  While in form a law, it is in effect a decree.  It is in no sense a *rule* of conduct, but it is a decree which reaches and operates only upon the particular transaction and parties referred to.  *Durkee* v. *City of Janesville,* 28 Wis. 464; *Wally* v. *Kennedy,* 2 Yerger, 554; *Jones* v. *Perry,* 10 Yerger, 59; *Lewis* v. *Webb,* 3 Greenl. 326; *Sanborn* v. *Com'rs of Rice Co.,* 9 Minn. 258, (273.)

8. The act is clearly and palpably unconstitutional, as being in conflict with Const. art. 9, § 2, as amended in November, 1860, which provides that "no law laying a tax or making other provision for the payment of interest or principal of the bonds denominated 'Minnesota State Railroad Bonds' shall take effect or be in force until such law shall have been submitted to a vote of the people of the state, and adopted by a majority of the electors of the state voting upon the same."  The act in question does make provision for the payment of the interest and principal of those bonds, and has not been submitted to the people, nor adopted by a majority of the electors; nor does the act, save in one contingency, (see sections 2 and 5,) provide for a submission to the people.

It is argued that the constitutional amendment is inoperative and void because in conflict with the United States constitution, art. 1, § 10, which forbids a state to pass any law "impairing the obligation of contracts."

It is the duty of the court to sustain the amendment unless its invalidity is placed beyond a reasonable doubt. *Wellington, Petitioner,* 16 Pick. 87, 95; *Fletcher* v. *Peck,* 6 Cranch, 87, 128; *Ogden* v. *Saunders,* 12 Wheat. 213, 270.

The obligation of the contract claimed to exist between the state and the holders of the railroad bonds was not and is not such an obligation as is protected by the federal constitution.

Obligations are of two kinds, perfect and imperfect, or, as Pothier puts it, "civil and natural." The imperfect or natural obligation is binding in morals but cannot be enforced by action. The perfect or civil obligation alone is binding in law, and gives the obligee the right to enforce it in a court of justice. The federal constitution protects from impairment only the civil and perfect and not the imperfect or natural obligation of contracts. This civil obligation—or legal obligation—consists in the remedy given by the law to enforce its performance or to make compensation for the failure to perform it. Pomeroy on Const. §§ 588-616; 2 Story on Const. § 1392; *Blair* v. *Williams,* 4 Litt. (Ky.) 35; *Lapsley* v. *Brashears,* Id. 47; *Dartmouth College* v. *Woodward,* 4 Wheat. 518, 629; *Ogden* v. *Saunders,* 12 Wheat. 213, 257, 318–337; *Bronson* v. *Kinzie,* 1 How. 311, 316; *McCracken* v. *Hayward,* 2 How. 608; *Curran* v. *State of Arkansas,* 15 How. 304, 319; *Von Hoffman* v. *City of Quincy,* 4 Wall. 535, 552; *Walker* v. *Whitehead,* 16 Wall. 314; *Edwards* v. *Kearzey,* 96 U. S. 595; *Railroad Co.* v. *Tennessee,* 101 U. S. 337; *Railroad Co.* v. *Alabama,* Id. 832; *Louisana* v. *New Orleans,* 102 U. S. 203; *Blann* v. *State,* 39 Ala. 353; *Wood* v. *Wood,* 14 Rich. (S. C.) 148, 154; *State* v. *Carew,* 13 Rich. (S. C.) 498, 508.

In every case to be found in the books the courts recognize that it is the civil or legal obligation alone that is protected by this clause of the constitution. In *Dartmouth College* v. *Woodward,* 4 Wheat. 518, *Marshall,* C. J., says (p. 629:) "This provision never has been understood to embrace other contracts than those which respect prop-

erty or some object of value, *and confer rights which may be asserted in a court of justice.*" And in any subsequent case down to the latest—*Louisiana* v. *New Orleans*, 102 U. S. 203, where the court says that "the obligation of a contract, in the constitutional sense, is the means provided by law by which it can be enforced, by which the parties can be obliged to perform it"—the courts have either tacitly or expressly held that the means of enforcement were absolutely essential to bring a contract within this constitutional provision. There can be no legal obligation to perform a contract if the law provides no means of compelling performance. Where such compulsion is withdrawn, the legal obligation ceases to exist. *Wood* v. *Wood*, 14 Rich. (S. C.) 148, 154.

The contract under consideration belongs to the class of imperfect or natural obligations, and is therefore not protected by this clause of the constitution. There are not now and have never been any means of enforcing—that is, compelling—performance by the state. Legal enforcement means enforcement by and through the courts; but the state is not amenable to the courts. As the state has no political superior, there can nowhere be any superior external force which can be exerted to compel her by means of law.

The "faith and credit of the state" are what was "pledged." No particular fund was provided for the payment of these bonds; no officers amenable to the compulsion of the courts or of any other power were charged with the fulfillment of these obligations. For such a pledge the remedy is wholly a moral one. *Sunbury & Erie R. Co.* v. *Cooper*, 33 Pa. St. 278. Those dealing in the bonds of a state know that they must rely altogether on the sense of justice and good faith of the state. *Bank of Washington* v. *State of Arkansas*, 20 How. 530. Such executory contracts of a state have no other than a moral sanction, and depend on good faith for performance. No money can be drawn without an appropriation, and no power can compel the legislature to make one. *Swann* v. *Buck*, 40 Miss. 268, 296; *Railroad Co.* v. *Alabama*, 101 U. S. 832. Even if the state could be sued, and judgment obtained against her, everything after the judgment would depend on the will of the state. There can be no remedy to enforce a contract if performance is left to the will of him on whom

the obligation to perform rests. "A remedy is only worked after entreaty is ended. Consequently, *that is not a remedy, in the legal sense of the term, which can only be carried into effect by entreaty.*" *Railroad Co.* v. *Tennessee,* 101 U. S. 337, 340. And see *Ex parte State,* 52 Ala. 231; *Hunsaker* v. *Borden,* 5 Cal. 288; *Sharpe* v. *Contra Costa Co.,* 34 Cal. 284.

The constitutional amendment did not act directly on the contract claimed to have been made by the issuance of those bonds. The charge is that the obligation of that contract has been violated by a substantial interference with some supposed remedy that the bondholders had against the state. But the bondholders never had any remedy. The fact that it was deemed necessary to constitute this extraordinary tribunal and submit to it this question, shows that the bondholders themselves realized that they had no remedy. If remedy they had, it has not been and cannot be taken away.

And the amendment did not interfere or profess to interfere with the so-called remedy which they had. The amendment does not prevent or prohibit the enactment of a law providing for payment of the bonds. It merely regulates the procedure by which such a law is to be enacted. A constitutional provision that a bill be read five times instead of three, or should need a two-thirds vote, instead of a majority; or reducing the legislative assembly to one body, or increasing it to three, would be no less objectionable than this amendment. The recent amendment providing for biennial sessions must be invalid, if the bondholders' position is correct, because it prevents them from applying to the legislature as often as they could otherwise have done.

The right to entreat the legislature to pass a law to pay the principal or interest, or both, is not abridged in the least. The power of the legislature to pass such a law is not taken away; but such a law must be submitted to the people before it can become operative. A state, by contracting a debt, does not thereby deprive herself of the right to alter the mode in which her laws are enacted. All the bondholders can claim that they possessed was a right to have a law enacted. If the amendment interferes with that right because of the requirement that such a law be submitted to the people, and because

that branch óf the law-making power may not concur with the others, the same objection could be made to any amendment changing the mode of enacting laws—to an amendment creating a third house, and requiring the concurrence of all three; or giving to the governor a veto power, not possessed by him when the bonds were issued; or requiring a two-thirds instead of a majority vote to pass a bill in the first instance; or requiring a three-fourths instead of a two-thirds vote to pass a bill over a veto. None of the changes would interfere with the bondholders' "remedy," and all of them are within the unquestionable power of a state to regulate the manner of enacting laws.

*Gordon E. Cole,* for respondents.

1. It is a mistake to treat the constitutional amendments of 1858 and 1860 and the act of 1881 as ordinary laws governing the rights of citizens. A state may exist in two capacities,—that of a sovereign and that of a contractor. When she enters the market and contracts an indebtedness, and launches her pledge of public faith with her negotiable securities upon the markets of the world, she doffs the plumes of her sovereignty, and for the purposes of that transaction is a borrower, with agents through whom she may act, and by whose acts she is bound. By her legislature, which is supreme, except as restrained by the constitution, and which is her general agent, she may contract the indebtedness; by the same agent she may pay it. She may contract absolute or contingent liabilities, she may make absolute or conditional payment and she may load down her promise or proposals of performance with any conditions she pleases.

In 1858 the state of Minnesota issued her negotiable instruments which she promised to pay at maturity. In 1860 she attempted to rescind her contract without returning any of the consideration and without any consent of the other contracting party. This we contend she could not do. As it took both the state and the bondholder to make the bargain, so it required the concurrence of the same parties to unmake it.

But for the amendment of 1860, the legislature might pay the debt in full. If it was competent for it to do that, it was competent for it to do less, with the consent of the other contracting party. When the

legislature passed the act of 1881, it made an offer to pay fifty cents on the dollar of the face value of its obligations, upon certain conditions, which have been accepted by the bondholders. The act of 1881 is not "a rule of action" in the sense of Blackstone's definition of a law. It is a treaty of adjustment between a sovereign state and her creditors.

Individuals would have the right to settle a controversy by referring their differences to the arbitration of a tribunal mutually chosen. Such a tribunal would not be a court, though it would exercise powers in their nature judicial. No writ of prohibition would lie to such a tribunal, and the only mode of correcting a mistake or enforcing the decision would be by suit upon the arbitration bond or agreement. And a state, in her commercial dealings, is not debarred by some absurd construction of constitutional provisions, framed for an entirely different purpose, of a privilege which every citizen possesses.

The case of *Western Railroad Co.* v. *De Graff*, 27 Minn. 1, is on all fours with the present one. The court there held that it was not a question of judicial powers that was involved, but that the legislature might do with its own, or with the property of the state, as it pleased. In *State of Wisconsin* v. *Torinus*, 28 Minn. 175, the court disposes of the objection that the act of the legislature of Wisconsin involved the exercise of judical powers, in a single line, and correctly, as we think, by saying that it was a case of principal and agent and of ratification, and not of judicial power. The distinction between what a state may thus do in her own matters as a business principal, and what she may do by passing a general law to affect for all time the rights of third persons is well illustrated by several of the cases cited by counsel on the other side. See *Sanborn* v. *Com'rs of Rice Co.*, 9 Minn. 258, (273.)

Instances of reference to arbitration by states and governments are numerous. The presidential commission in 1877 and the Geneva tribunal are familiar cases. Scarcely a session of our legislatures passes that boards are not constituted to audit claims against the state. Nobody has ever doubted the validity of these measures and yet they have not, as in this case, the consent of parties whose

claims are to be passed upon to this submission. These measures are sustained for the reason that as the state may pay without any condition, so she may voluntarily pay under such conditions as she may see fit to impose. See Laws 1862, Ex. Sess. *c.* 3; *c.* 18, § 1, subd. 10; Laws 1863, *cc.* 1, 65; Laws 1864, *c.* 21; Laws 1878, *c.* 1, § 119; *c.* 87; *Murray* v. *Hoboken Land & Improvement Co.,* 18 How. 272.

2. The act of 1881 does not delegate legislative powers. It takes effect from and after its passage. The legislature decide that this law ought to pass. As passed it is in the alternative, and they refer to a commission to determine a state of things upon which the operation of the law depends. "To deny the power to do this, would be to stop the wheels of government." *Locke's Appeal,* 72 Pa. St. 491, 498, overruling *Parker* v. *Commonwealth,* 6 Pa. St. 507, cited by counsel on the other side. Local option laws are similar in this respect to the act of 1881, and they are now sustained in nearly every state in the Union, although in the early history of these cases, the courts were in much doubt and the decisions in much confusion. The present result has been arrived at by a precisely opposite course of reasoning from the earlier cases. *Santo* v. *State,* 2 Iowa, 164; *Parker* v. *Commonwealth,* 6 Pa. St. 507; *Ex parte Wall,* 48 Cal. 279; *Houghton* v. *Austin,* 47 Cal. 646; *Slinger* v. *Henneman,* 38 Wis. 504; *Darling* v. *City of St. Paul,* 19 Minn. 389; *Board of Supervisors* v. *Jackson Co.,* 77 Ill. 59; *Hardenburg* v. *Kidd,* 10 Cal. 402; *Thorne* v. *Cramer,* 15 Barb. 112; *Barto* v. *Himrod,* 8 N. Y. 483, cited by counsel are either not in point or have been overruled. The following authorities will be found to support conditional or alternative laws similar to the act of 1881. *Bank of Rome* v. *Village of Rome,* 18 N. Y. 38; *Smith* v. *City of Janesville,* 26 Wis. 291; *Locke's Appeal,* 72 Pa. St. 491; *Roos* v. *State,* 6 Minn. 291, (428;) *State* v. *Parker,* 26 Vt. 357; Cooley on Const. Lim. 143, note 2; 147, note; *Lothrop* v. *Stedman,* 42 Conn. 583; *Bull* v. *Read,* 13 Gratt. 78; *Morgan* v. *Monmouth Plank Road Co.,* 26 N. J. Law, 99; *Peck* v. *Weddell,* 17 Ohio St. 271; *Walton* v. *Greenwood,* 60 Me. 356; *Mayor of Baltimore* v. *Clunet,* 23 Md. 449.

3. It is claimed that the act of 1881 is void because it does not vest judicial powers in the judges in a judicial manner.

It is a fundamental maxim of all our American governments that neither department shall invade the province or perform the duties of either of the others, and therefore it is claimed that no judicial power can be conferred on anybody but judges under the constitution. If by this is meant that nobody but a judge elected as prescribed by the constitution can constitute a court in the full meaning of the term, we concede it, and cases cited by counsel to that point are good authority. The early California cases cited by counsel on the other side went too far, and succeeded in getting matters in such a general mess in that state, that in *People* v. *Provines*, 34 Cal. 520, the supreme court stepped in and reversed them all. If, however, the counsel on the other side claim that by the constitutional provision is meant that no powers in their nature judicial can be conferred on anybody but a judge elected under the constitution, he is in error. Powers of such nature and similar to those conferred in the act of 1881, have frequently been vested, in others than the constitutionally elected judges, and the laws vesting the same sustained. *Home Ins. Co.* v. *Flint,* 13 Minn. 244; *United States* v. *Ferreira,* 13 How. 40; *In re Kaine,* 14 How. 103; *In re Metzger,* 5 How. 176; *Ex parte Vallandingham,* 1 Wall. 243; *Murray* v. *Hoboken Land & Imp. Co.,* 18 How. 272; *Ex parte Gist,* 26 Ala. 156; *Ex parte Gordon,* 1 Black, 503; *City of Burlington* v. *Leebrick,* 43 Iowa, 252; *Canada Northern Ry. Co.* v. *International Bridge Co.,* 7 Fed. Rep. 653.

4. It is argued that the act of 1881 is unconstitutional as being in conflict with the constitutional amendment of 1860. In answer we say that this amendment is unconstitutional because in conflict with the provision of the federal constitution which forbids a state to pass any law "impairing the obligation of contracts."

There is an existing obligation.

The contract of the state is not one without a remedy. The want of a remedy and the inability to obtain the fruits of one are quite distinct. *Rees* v. *City of Watertown,* 19 Wall. 107, 124. The power in the legislature, by which it could compel the people who in their primary capacity issued these bonds and whose legislative department had at the time of their issue the same power to compel them to pay them that the courts had in a contract between private parties,

this was our remedy. This was the *vinculum juris*. *Von Hoffman* v. *City of Quincy*, 4 Wall. 535. 2 Story on Const. § 1385.

True, its fruits cannot always be reached, but it is there, dormant it may be and ready to spring into action, and always and invariably enforced by the courts when presented in a manner where they can reach it. *White* v. *Hart*, 13 Wall. 646.

These bonds are not imperfect contracts within the distinction made by Pothier, relied on by counsel on the other side. The distinction made by the court in *Ogden* v. *Saunders*, 12 Wheat. 213, and by Pothier, between perfect and imperfect contracts, has not in view the contracts of states or the mode of their performance, but deals with private contracts, and makes the distinction between those which are without valuable consideration, or were void in accordance with the provisions of some law, as the statute of limitations or the statute of frauds. The citation from Story's Commentaries on the Constitution, like those of counsel from *Ogden* v. *Saunders*, have no reference to a case like the present. An examination of the reasoning and conclusions in this last case will show that the court arrive at results directly opposite to those claimed by counsel. From his Commentaries on the Constitution, §§ 1380, 1382, 1386, it will be seen that Justice Story was talking about illegal contracts, that is, prohibited by positive law, and nude pacts.

In *Ogden* v. *Saunders* it was held that a state could constitutionally pass an insolvent law which should discharge its citizens from contracts made in the state after its passage. It was argued that the insolvent law impaired the contract, but the court said that there was a distinction between impairing the contract and impairing the obligation, and that they could not admit that a contract under the law of nature, and which in honor a man ought to abide by, as every man ought to perform his promise, was intended to be protected by the constitution, except as such contracts were modified and controlled by the existing law of the state at the time the contract was entered into. The obligation of the contract is defined to be "the law which binds one to perform his agreement."

When these bonds were issued the law was in existence which approved the legislative prerogative and duty to levy a tax to pay the

principal and interest, and the people of this state in their fundamental law assured the bondholders not only that they would pay their bonds, but that they had deposited with a select body of men (the legislature) in solemn trust the power and duty to compel them to perform their agreement by levying a tax and summarily enforcing its collection. Here was the *vinculum juris.* The then existing law making it the duty of the legislature to provide for the payment of these bonds constituted the obligation of this contract.

"The obligation of the contract consists not in the contract itself, but in a superior external force controlling the conduct of the parties in relation to the contract, and that this superior external force is the law of the state either tacitly or expressly recognizing the contract and furnishing the means whereby it can be enforced." In the case of a state it is the legislative power of appropriation and levy which is the superior external force and the law of the land vested in them in case of a public debt in trust.

A consideration of the history of the times when the prohibition in the federal constitution was adopted and the able arguments in favor of its adoption by the writers of the Federalist, indicate that state and federal obligations were prominent in the minds of the framers of the constitution. *Fletcher* v. *Peck,* 6 Cranch, 87.

It is the character of the contract itself, and not that of the parties to it, that determines the right to violate. These bonds cannot be valid in the hands of the state of Ohio and void in those of our clients, nor can they be valid in the hands of a person owing the state and not in those of one who did not. Suppose a state officer should become a defaulter and upon being sued should set up these bonds as a counter-claim, why could he not bar any judgment against him and thus practically enforce a remedy. One of Pothier's imperfect contracts is incapable of enforcement everywhere and by everybody. These state contracts are enforced by the courts whenever they can reach them. A contract cannot be said to have no obligation which, under circumstances which may arise and which exist potentially, as Justinian says, may be enforced.

In *Railroad Co.* v. *Tennessee,* 101 U. S. 337, and *Railroad Co.* v. *Alabama,* Id. 832, it was held that the legislature may repeal a law

v.29—32

consenting that the state may be sued and directing the auditor to issue his warrants on the judgments. Such a law may be repealed. It is the final power and potentiality of a legislative appropriation and levy which is the tangible thing, and that the legislature have surrendered to the people and destroyed the only thing that was the real obligation of our bonds. No legislature ever before abrogated its powers and surrendered its especial and peculiar prerogative of levying taxes into the hands of the tax-payers. In the cases cited, suppose that the law permitting the suit had gone further and provided that on filing the judgment the governor should pay it or provide for its payment, and this being the law when the contract was made, a subsequent law had repealed it, would not such legislation have been void as impairing the obligation? And this for the reason, that the presumption that the governor, though he could not have been compelled to perform his duty, would obey the law is as much a remedy as the presumption that judges would do the same thing and enforce a remedy.

The remedy for enforcing contracts against a city capable of being sued, is through the courts. In the case of a sovereign state it is through the legislature. Where they have not the power to grant a remedy, it is conceded, as decided in *Railroad Co.* v. *Tennessee*, 101 U. S. 337, and *Railroad Co.* v. *Alabama*, Id. 832, that the power to determine may be taken away, because unaccompanied by the power to enforce judgment it is valueless. But suppose in the separate cases of a city and a state, that they both have power at the date of the contract to afford full relief. In the case of the city, the power, right and obligation rest in the court to afford relief to the public creditor; in that of the state, they rest in the legislature. Now suppose the state adopts, after the issue of city bonds, a constitutional amendment prohibiting the enforcement by the courts of these bonds, would not this impair the obligation of the contract; and suppose that, notwithstanding this constitutional amendment, the courts had gone on and enforced these bonds, can there be any doubt that their action would have been sustained. So, in the case of a state, if she adopt, after the issue of bonds, an amendment to the constitution withdrawing absolutely from the legislature the power of taxation for

the purpose of their payment, and the legislature disregarding the amendment proceed to pay the bonds by taxation, their action would be sustained whenever the question came before any body authorized to pass upon it.

The impairment of solemn obligations which bids defiance to the creditor is not of infrequent occurrence, and, while it is conceded that the contract is grossly and glaringly impaired, the courts have confessed themselves powerless to enforce the remedy. Such cases are *Rees* v. *City of Watertown,* 19 Wall. 107; *Garrett* v. *City of Memphis,* 5 Fed. Rep. 860; *Meriwether* v. *Garrett,* 102 U. S. 472.

But invariably wherever the courts have had power to enforce their utterances they have held such attempts on the part of states, as that in the case at bar, void. *Woodruff* v. *Trapnall,* 10 How. 190; *Furman* v. *Nichol,* 8 Wall. 44; *Hartman* v. *Greenhow,* 102 U. S. 672.

5. Assuming that the obligation exists, it has been impaired by the constitutional amendment of 1860.

"The test is not the extent of the violation of the contract, but the fact that in truth its obligation is lessened in however small a particular." *Planters' Bank* v. *Sharp,* 6 How. 301, 327; *United States* v. *Jefferson County,* 5 Dill. 310; *Edwards* v. *Kearzey,* 96 U. S. 595; *Green* v. *Biddle,* 8 Wheat. 1; *Walker* v. *Whitehead,* 16 Wall. 314.

"The remedies for the collection of a debt are essential parts of a contract of indebtedness, and those in existence at the time it is incurred, must be substantially preserved to the creditor. Thus a statute prohibiting the exercise of its taxing power by the city to raise money for the payment of these bonds would be void." *Rees* v. *City of Watertown,* 19 Wall. 107, 120; *Von Hoffman* v. *City of Quincy,* 4 Wall. 535; *City of Galena* v. *Amey,* 5 Wall. 705; *Riggs* v. *Johnson Co.,* 6 Wall. 166, 194; *Keith* v. *Clark,* 97 U. S. 454.

The supreme court of the United States has held repeatedly that where the legislature confers upon a municipality authority to levy and collect a tax to meet the interest on bonds it may issue, such authority becomes a part of the contract when bonds are issued, and cannot be revoked to the prejudice of the bondholders. "The power given becomes a trust which the donor cannot annul, and which the donee is bound to execute."

Therefore, the power and authority which the people conferred upon the legislature to provide for the payment of the bonds in question became a trust, which the people could not revoke and which the legislature was bound to execute. It was part and parcel of the contract and could no more be annulled by the legislature or the people than could the bonds themselves. The attempt to amend it aimed at more than the mere remedy; it was a blow directed at the vitals of the contract itself. *United States* v. *County Court of Howard Co.*, 2 Fed. Rep. 1; *Nat. Bank* v. *Sebastian Co.*, 5 Dill. 414; *United States* v. *Jefferson Co.*, 5 Dill. 310; *Corbin* v. *Com'rs of Washington Co.*, 3 Fed. Rep. 356; *Louisiana* v. *United States*, 103 U. S. 289; *Wolff* v. *New Orleans*, Id. 358.

The validity of a contract which can only be fulfilled by a resort to taxation, depends on the power to levy a tax for that purpose. The authority to create a debt implies an obligation to pay it; and where no special mode is provided, it is implied that it may be done in the ordinary way by the levy and collection of taxes. Dillon on Mun. Corp. § 685; *Loan Association* v. *Topeka*, 20 Wall. 655, 660; *Commonwealth* v. *Allegheny Co.*, 37 Pa. St. 277; *United States* v. *Lincoln Co.*, 5 Dill. 184, 195; *United States* v. *Jefferson Co.*, 5 Dill. 310. From these cases it appears that the existing power of taxation resting in the legislature at the time these bonds were issued was intimately and inextricably blended with the contract entered into, and was not only part of it, but the vital part of it, without which a contract with the state would be but mere blank paper, a thing without value. Take away the power of taxation and you destroy the validity of the contract. Add new and obstructive conditions after the contract has become perfect and you impair the obligation.

The legislature cannot divest itself of this power as against creditors who have invested their money on the faith that it existed and would be exercised.

The final and absolute remedy of the public creditor lies not in his power to sue and have his claim adjudicated in a tribunal which is powerless to enforce its decrees, nor in the direction to the executive officers to issue their warrants, unless supported by a legislative levy and appropriation, but in the presumption that the faith of a sov-

ereign state will be kept and adequate provision made therefor by that body to which it is entrusted.

The amendment of 1860 impairs the obligation of these contracts by forbidding their payment "until submitted to a vote of the people and adopted by them" as much as if it had declared that no tax should ever be levied or other provision made for their payment. Potter's Dwarris on Statutes, 477; *Fletcher* v. *Peck*, 6 Cranch, 87; *Chamberlain* v. *St. Paul & Sioux City R. Co.*, 92 U. S. 299.

The decisions of the federal tribunals are not merely of persuasive force but are conclusive authority upon the state courts upon these questions. The following decisions of state courts are analogous: *State* v. *City of Madison*, 15 Wis. 33; *People* v. *Bond*, 10 Cal. 563; *McCauley* v. *Brooks*, 16 Cal. 11; *Western Savings Fund Society* v. *Philadelphia*, 31 Pa. St. 175; *Robinson* v. *Magee*, 9 Cal. 81.

*J. B. Sanborn*, also, for respondents.

The rule to show cause why a writ of prohibition should not issue out of this court against the judges should be discharged.

The powers about to be exercised by the judges are administrative or ministerial and not judicial, and the entire function of the writ of prohibition is to restrain the usurpation of judicial powers or the exercise of judicial power where the legal right to exercise it does not exist. High on Extraordinary Remedies, § 769; *Ex parte Braudlacht*, 2 Hill, 367; *In re Mount Morris Square*, 2 Hill, 15; *State* v. *Clark Co. Court*, 41 Mo. 44.

The extent to which the judges propose to act is to hear arguments, and determine and decide whether the legislature has the power, notwithstanding the amendment of 1860, to provide for the payment, adjustment and settlement of these bonds. Not a function or power is vested in this tribunal that is not daily vested in referees and arbitrators by agreement of parties, by courts, executive officers and citizens, and such proceedings have always been sustained by the courts and held not to infringe upon the judicial power. *Heckers* v. *Fowler*, 2 Wall. 123, 128; *Alexandria Canal Co.* v. *Swann*, 5 How. 83, 89.

The contention on behalf of the relator is that a writ of prohibition may issue to restrain acts in their nature judicial. We insist that the only office and function of the writ is to restrain the unlawful

exercise of judicial power. Judicial acts and acts in their nature judicial are as common among corporations, individuals and throughout society as leaves in a forest.

In disputes between parties, a reference to referees or arbitrators with power to take testimony, to find the facts and report what is right to be done between, is all in its nature judicial, but it is no exercise of judicial power. It all stands upon the right of parties to make contracts and is in itself a contract. Such is the case at bar. There is no power of the state called for, and none is exercised; all is done by the right and power of the parties. Judicial power is that power of the state or sovereignty which is used to settle contests between parties in the manner prescribed by law, without reference to their choice and will.

Our state constitution is silent as to the definition of this power. The only references to it are found in section 8 of article 1 and section 1 of article 6. But there can be no doubt that it extends to all cases at law or in equity which do not fall under the judicial power of the United States and that there is nothing else that can call for the exercise of judicial power.

In the case at bar there is no suit at law or in equity. There is no controversy. It will be conceded that the preamble to an act carries the greatest weight in all disputed questions concerning its construction. Is there anything in the preamble to the act of 1881 which indicates that the judicial power is to be called into exercise? Is there any one here to be called into court? Any one required to answer? Any one against whom judgments are to be rendered or against whom process is to run? It is an amicable adjustment of disputed claims. It simply requests certain judges to consider a single question in a matter of arbitration. If this law had required this tribunal to meet during the session of the legislature, hear arguments, determine the question submitted and file their decision with the clerks of the houses, who could object?

It matters not what such a body of men is called, whether court, tribunal or commission, its powers and rights must be determined from its duties and purposes. Potter's Dwarris on Statutes, 369; *Weister* v. *Hade*, 52 Pa. St. 474.

If the law is not unconstitutional, though trampling upon the most sacred principles of right and justice, the judicial department cannot pronounce it void. *Calder* v. *Bull*, 3 Dall. 386 ; *Satterlee* v. *Matthewson*, 2 Pet. 380.

As the legislature may pass an act to go into effect upon a contingency, so may it pass one in the alternative. *State* v. *O'Neil*, 24 Wis. 149 ; *Smith* v. *City of Janesville*, 26 Wis. 291 ; *Slinger* v. *Henneman*, 38 Wis. 504.

It is insisted that the act of 1881 is in violation of the constitutional amendment of 1860. This amendment is void under the federal constitution.

It is a principle of law of almost universal application that the existing laws enter into and become a part of a contract. This principle is so universal as to need no citations. These bonds were issued with the positive pledge, faith and credit of the state for the payment of the interest and principal of the same by the legislature. The language of the constitution was "the legislature *shall* provide for an annual tax sufficient to defray the estimated expenses for the state for each year."

It is claimed by the relator that where there are no obligations of contracts none can be impaired; no obligations of contracts can exist where a right of action to enforce them does not exist; no right of action to enforce any obligations on behalf of the state exists, and therefore there can be no obligations of contracts on the part of the state that can be impaired. The fallacy of this argument is that it claims that a right of action against the state upon its contracts must exist at all times in favor of everybody having such a contract. It is sufficient if it may exist under any circumstances. Another and a greater fallacy is that there can be no obligations of a contract where a legal remedy according to the course of the common law does not exist. The right to prosecute a claim before the legislature by petition is as sacred and valuable as the right to prosecute a case in a court of chancery. There is very little dissimilarity in the proceedings. In the court the rights of the party are set forth by a bill, in the legislature by a petition. If a contract existed between citizens of two states, the whole value of which depended upon the right to its

specific performance, which could only be decreed by a court of chancery, and the legislature should abolish the court of chancery or provide by a constitutional amendment that no decree of a court of chancery should be valid until it was submitted to a vote and approved by a majority of the electors of the state, would not that impair the obligations of that contract? In the case at bar, the power to hear petitions and pay these bonds is taken from the legislature and relegated to the electors of the state, if the amendment of 1860 is valid, and the bondholders deprived of their right to appear and plead their cause before the legislature, which right is as sacred and as valuable as the right to any legal remedy that exists in any department of the government.

*John M. Gilman*, also, for respondents.

1. A writ of prohibition only issues to an inferior court. High on Extraordinary Remedies, §§ 765, 768, 769, 779, 782; *Board of Com'rs* v. *Spitler*, 13 Ind. 235; *People* v. *Supervisors of Queens*, 1 Hill, 195; *Burger* v. *Carter*, 1 McMullen, 410. And only where damage and injustice are likely to follow from such action. No damage is to result to any one from any act the bond tribunal is to perform. It merely gives an opinion. It carries no decision or opinion into operation or execution. You cannot prohibit the activities of the mind, nor the expression of the conclusions at which it may arrive on any subject, but only overt acts which will do damage or injury, and which are beyond the legal jurisdiction of the party to do. It is argued that an extra judicial opinion given by this tribunal would have no binding force or efficacy. If that is so, such an opinion, if given, could certainly do no damage or injury, however improper. The writ must be denied, therefore, because it is not against an inferior tribunal, because what is proposed to be done is not a matter in contempt of the sovereign, because no damage or injury will result to the relator or any one else, and because it is a matter that cannot be made the subject of prohibition.

It is urged against the constitutionality of the act of 1881 that the judges can hold no other office. That is true, and they have accepted no other. None is created by the act. They merely give an opinion on a special matter. They take no oath and receive no compensa-

tion. The law requires the judges of this court to be present at the canvassing of the votes for state officers and congressmen. They have charge and oversight of the state library. They and the district judges may solemnize marriages, administer oaths, take acknowledgments, take and certify depositions and are conservators of the peace. District judges are required to fix the salary of county attorneys in certain cases (Gen. St. 1878, *c.* 7, § 3,) to advise sheriffs as to keeping prisoners (Gen. St. 1878, *c.* 8, § 203,) and to fix, pay and approve appointment of jailer (Gen. St. 1878, *c.* 8, § 209.) These laws do not create new offices, and the judges in exercising these powers are not accepting new offices. *Shepherd* v. *Commonwealth,* 1 Sergt. & Rawle, 1; *Commonwealth* v. *Binns,* 17 Sergt. & Rawle, 219.

It is also said that the judges cannot be required to perform the duties mentioned in the act of 1881. That is true. It is optional with them to do so, or not. *Mandamus* will not lie to compel them to act, and neither will prohibition to restrain them.

The act of 1881 does not delegate legislative functions. The complete law takes effect upon its passage. That its operation depends upon a contingency is not unusual. Nearly all laws depend upon contingencies for their enforcement and execution. We have numerous instances in our own statute books, which have been read and commented upon by associate counsel and it is therefore unnecessary to repeat them.

Nor are any judicial functions delegated by the act of 1881. The whole scope of the law is but a negotiation on the part of the state with its creditors. The governor or any one else might have been empowered in his discretion to settle with the creditors on such terms as he should deem best, and to exercise his own judgment or take the advice of others upon all questions of law and fact involved. The legislature, on behalf of the state, could do in the premises just what an individual could do in the adjustment of his own personal matters. The legislature passed upon all questions it was required by the constitution to pass upon. Now, *by the very passage of the law,* which took effect as a law upon its passage, *the legislature did pass its judgment against the validity of the constitutional amendment.* So

far as it was concerned, it authorized and directed settlement to be made with the creditors, without requiring the law to be ratified by a vote of the people. But, in addition to its own judgment in the premises, it also required, as it had a perfect right to do, as a prerequisite to such settlement, that the judges should give an opinion that the constitutional amendment was not a valid prohibition upon the legislature. It could impose this or any other condition as a prerequisite to a settlement with the bondholders.

The constitutional amendment of 1860 impairs the obligation of contracts, is therefore invalid and does not stand in the way of a legislative enactment for the adjustment of the bonds.

It must be admitted, and has frequently been decided, that the prohibition in the federal constitution applies equally to constitutional provisions as to legislative enactments, and to contracts of the state as to contracts of individuals. *Woodruff* v. *Trapnall*, 10 How. 190; *State Bank of Ohio* v. *Knoop*, 16 How. 369; *Railroad Co.* v. *McClure*, 10 Wall. 511; *Dodge* v. *Woolsey*, 18 How. 331; *Jefferson Branch Bank* v. *Skelly*, 1 Black, 436; *Pacific R. Co.* v. *Maguire*, 20 Wall. 36; *White* v. *Hart*, 13 Wall. 646; *Gunn* v. *Barry*, 15 Wall. 610; *Murray* v. *Charleston*, 96 U. S. 432; *United States* v. *Jefferson Co.*, 5 Dill. 310; *Meriwether* v. *Garrett*, 102 U. S. 472; *Davis* v. *Gray*, 16 Wall. 203, 232.

It is also axiomatic that the laws in force when a contract is concluded, enter into and constitute a part of it. The authorities are too numerous to cite many. *Von Hoffman* v. *City of Quincy*, 4 Wall. 535, 550; *Walker* v. *Whitehead*, 16 Wall. 314; *Edwards* v. *Kearzey*, 96 U. S. 595.

Let us examine what laws were in force when these bonds were issued. "The constitution," says Kent, "is the act of the people, speaking in their original character." These bonds therefore were issued by order of the people, and in doing so they said "the faith and credit of the state are hereby pledged for the payment of the interest and redemption of the principal thereof." But no specific directions were given. In respect to the issuing of the bonds the constitution was self-directing, but not as to payment. The legislature was vested with authority to levy taxes, raise revenue and disburse

the same. It is a principle of law that when a municipality is given authority to contract a debt it has, by necessary implication, the power to provide for payment thereof by taxation. *Loan Association* v. *Topeka,* 20 Wall. 655; *Louisiana* v. *United States,* 103 U. S. 289; *United States* v. *Lincoln Co.,* 5 Dill. 194; *Supervisors* v. *United States,* 4 Wall. 435.

The contract then on the part of the state is clearly defined. The bonds were issued by the authority of the people, acting in their original character and pledging the faith and credit of the state for their payment and at the same time conferring upon the legislature unconditional power, authority and direction to provide by law for their redemption.

Much is said about the obligation of these contracts and it is claimed that there is none existing which is protected by the federal constitution. It is said that only legal obligations are protected, that legal obligations or contracts are only such as can be enforced in a court of justice, and that as payment of the bonds could not be judicially enforced, the contract was not under the constitutional protection. If this doctrine is sound it is strange that it has never before been urged upon or before some court, or found recognition by some court or text writer.

The "obligation of contracts" was first defined in *Sturges* v. *Crown-inshield,* 4 Wheat. 122, 197. The court says "it would seem difficult to substitute words which are more intelligible or less liable to misconstruction than those which are to be explained. A contract is an agreement in which a party undertakes to do or not to do a particular thing. The law binds him to perform his undertaking, and this is, of course, the obligation of his contract. * * * Any law which releases a part of this obligation must, in the literal sense of the word, impair it." There is nothing in this definition to the effect, or implying, that there need be a right of action upon it in some court, in order to place it under constitutional protection. This definition has been repeatedly approved. *Von Hoffman* v. *City of Quincy,* 4 Wall. 535, 552; *Walker* v. *Whitehead,* 16 Wall. 314; *White* v. *Hart,* 13 Wall. 646; *McCracken* v. *Heyward,* 2 How. 608.

Occasionally, when a court is discussing the power of the legislature over the remedy, and nothing beyond the right to the remedy is in the mind, an expression is used that the obligation of a contract under the constitutional protection is the means provided by the law for its enforcement. That is one element of the obligation, but it does not follow that there must be a judicial remedy direct upon the contract. The technical definition of "obligation" found in the civil law has not been adopted by either the federal or state courts. Pomeroy on Const. Law is cited in support of the civil law definition. But examination will show that in the conclusions in this work, it agrees with the definition of the federal courts. *Vide* §§ 592, 596. Counsel has cited Marshall, C. J., in *Dartmouth College* v. *Woodward*, 4 Wheat. 518, 629, as saying that "this provision of the constitution never has been understood to embrace other *contracts* than those which respect property, or some object of value, and confer rights which *may be asserted* in a court of justice." Mark, he is speaking of contracts and the *obligation* of contracts, and says that *contracts* which are under constitutional protection are such as confer rights which may be *asserted* in a court of justice; that is, whenever they can properly be brought before a court of justice. That is just what we are now doing in respect to the contract we have with the state. We are here asserting our rights. It was Chief Justice Marshall who defined the obligation of a contract, in the constitutional sense, "to be the law which binds the parties to perform their agreement" (*Sturges* v. *Crowninshield*, 4 Wheat. 122,) and it was also he who decided that a compact between states was within the constitutional protection. Story on Constitution, §§ 1380, 1382 and Cooley on Const. Lim. 348 (4th Ed.) state the law forcibly and clearly, and the citations by counsel on the other side from these writers when read in connection with these sections, are correct rules of law, but support a directly contrary principle from that claimed. Bouvier, Law Dict. "Right" and "Obligation."

There is nothing said by the courts about the necessity of a judicial remedy to enforce the contract in order to bring it under constitutional protection. The remedy, *such as it is*, judicial, legislative or

otherwise, must not be taken away until the contract is performed. *McCracken* v. *Hayward*, 2 How. 608, 612; *Ogden* v. *Saunders*, 12 Wheat. 213, 256; *Walker* v. *Whitehead*, 16 Wall. 314, 317. "Validity and remedy both are parts of the obligation." Not remedy alone. If the contract is *valid* the obligation arises and exists, however inefficient the remedy may be; even though there be no adequate remedy.

A *contract* then, as defined by the federal courts, by Story and Cooley, and even by Pomeroy, is "an agreement to do, or not to do, a particular thing" and the *obligation* of the contract "is the law which rests upon a party to perform his agreement." The right to have the contract *judicially* enforced is not an element in the definition.

It is claimed that the obligation and remedy are synonymous terms, and that there is *no* remedy known to the constitution unless it can be *judicially* enforced, and that therefore the bondholders had *no* remedy, because they had none that the courts could enforce.

Now, if they had *no* remedy or obligation, it follows that they had *no legal rights* and *no contract.* It is said in *Ogden* v. *Saunders*, 12 Wheat. 213, 282, that "*rights and obligations* are considered by all ethical writers as correlative terms," and in *Von Hoffman* v. *City of Quincy*, 4 Wall. 535, that "the ideas of validity and remedy are inseparable, and both are parts of the obligation which is guaranteed by the constitution against invasion." Therefore, if counsel is right, the bondholders have no rights, obligation or contract whatever and have nothing to say about the constitutional amendment of 1860.

The mistake of counsel is in stating that obligation and remedy are identical. This is not true. They are two entirely distinct things. *Sturges* v. *Crowninshield*, 4 Wheat. 122; *Ogden* v. *Saunders*, 12 Wheat. 213; *Charles River Bridge Co.* v. *Warren Bridge*, 11 Pet. 420, 573. The obligation is the law which binds the party to perform, while the remedy is the law or agreement in operation for the execution of the law or agreement. The obligation exists whether the remedy is called into exercise or not. They are so connected and related, however, that the obligation may be of little value without the remedy, and an injury to the remedy may impair the obligation.

If the proposition that the constitution only protects from impairment such obligations and remedies as can be judicially enforced, then the executory contracts of a state are not shielded from impairment, and there is nothing to prevent a state, after issuing her bonds, to reduce the interest, defer payment or deny all liability. But this is not true. Suppose after such action the state should allow herself to be sued, would she not be held liable? The authorities are numerous on the liability of a state upon her contracts and the courts have always held her strictly to her contracts whenever the opportunity to do so has been presented. *Fletcher* v. *Peck*, 6 Cranch, 87, 137; Dwarris on Const. Construction, 477; Cooley on Const. Law, 301; *New Jersey* v. *Wilson*, 7 Cranch, 164; *Green* v. *Biddle*, 8 Wheat. 1; *Antoni* v. *Wright*, 22 Gratt. 833; *Hartman* v. *Greenhow*, 102 U. S. 672; *Chamberlain* v. *St. Paul & Sioux C. R. Co.*, 92 U. S. 299; *Woodruff* v. *Trapnall*, 10 How. 190; *Furman* v. *Nichol*, 8 Wall. 44; *Ogden* v. *Saunders*, 12 Wheat. 213; *White* v. *Hart*, 13 Wall. 646; *Keith* v. *Clark*, 97 U. S. 454.

Counsel claim that the authority vested in the legislature by the constitution to provide the means for paying the interest and principal of the bonds, did not constitute any part of the contract or of its remedy, for the reason that remedial powers are judicial, and by the constitution cannot be vested or exercised outside the judiciary. If this be sound, how is it that the power of sale by a mortgagee or trustee is under the constitutional protection against impairment. If this reasoning be sound as applied to the legislature, so must it be when applied to the executive, but it is well settled that where a legislature grants lands to a railroad company upon conditions, in case of the performance of the conditions by the railroad company, it cannot make other disposition of the lands. *De Graff* v. *St. Paul & Pac. R. Co.*, 23 Minn. 144; *Davis* v. *Gray*, 16 Wall. 203. This reasoning would apply to all executory contracts of a state, contrary to the rule in *Fletcher* v. *Peck*, 6 Cranch, 87.

Remedy implies relief. Relief from a broken contract consists in and comes by performance. Where the power of performance or execution is, there rests the remedy or relief. This may be legislative,

executive or judicial, or otherwise such extra-judicial power as the parties may agree upon.

The error of counsel is in confounding the *power* of a state to impair her contracts with the right to do so. The state has no more *right* to annul or impair her own contracts than she has the contracts of individuals; and any act which does so is equally unconstitutional, null and void, whether there be any judicial redress or not. "The want of a remedy and the inability to obtain the fruits of a remedy are quite distinct." *Rees* v. *City of Watertown*, 19 Wall. 107, 124; *Garrett* v. *City of Memphis*, 5 Fed. Rep. 860; *Ogden* v. *Saunders*, 12 Wheat. 213; *McCauley* v. *Brooks*, 16 Cal. 11. The question is not, can the state be compelled to act? but whether it can be legally *prohibited* from acting, as agreed upon by the parties. So long as the legislature refused to make any provision for the payment of the bonds it was simply a breach of the contract for which there was no redress. But when the state sought by the constitutional amendment to *prohibit* the legislature from carrying out the agreement, it impaired the contract, contrary to the federal constitution, the same as if an attempt should be made to inhibit the courts, or a trustee empowered to execute a special extra-judicial remedy, from acting. *Ogden* v. *Saunders*, 12 Wheat. 213, 337.

There are two distinct, well known and recognized modes of executing or enforcing contracts; one through the agency of the courts, and the other such as the parties may lawfully agree upon between themselves, and which is entirely extra-judicial. Both are under the constitutional protection. The contract with the bondholders was of the latter character. A special remedy was agreed upon. The legislature was clothed with power, authority and discretion to provide the means by taxation or otherwise to pay the bonds, and this, say the courts, was a trust which could not be revoked. *Von Hoffman* v. *City of Quincy*, 4 Wall. 535, 555; *United States* v. *Lincoln Co.*, 5 Dill. 202; *Antoni* v. *Wright*, 22 Gratt. 833; *Hartman* v. *Greenhow*, 102 U. S. 672, 681. The legislature was an intermediate tribunal between the people and the bondholders. The bonds were issued by the governor as agent. The remedial power with respect to the obligation of the contract was vested in the legislature. It was a trust

which formed part of a contract and could not be revoked to the prejudice of the bondholders.   It was a special and extra-judicial remedy, the same in principal as is conferred upon trustees in a railroad mortgage and other like cases.   That these remedies are protected by the federal constitution has been decided by this court and by all other courts where the question has arisen.   *Taylor* v. *Stearns,* 18 Gratt. 244; *Heyward* v. *Judd,* 4 Minn. 375, (483;)   *McCauley* v. *Brooks,* 16 Cal. 11.

It is suggested, rather than claimed, that the amendment to the constitution did not impair the obligation of the contract, but only affected the remedy, without any substantial interference.   Under the amendment the legislature has to do all that was originally required by the contract and the laws entering into it, with a new condition added—a submission to a vote of the people.   Suppose a railroad company, or any other corporation, should issue bonds and authorize its board of directors to provide for their payment, and should subsequently amend the charter by forbidding the payment except upon a vote of all the stockholders; or, suppose a partnership, having contracted an indebtedness, should afterwards agree that it should only be paid with the consent of all the partners, would these acts be valid as affecting the holders of the bonds, or the owners of the indebtedness?   Certainly not.

The legislature has control over the remedy, *"provided that it does not deny a remedy, or so embarrass it with conditions and restrictions as seriously to impair the value of the right."*   *Tennessee* v. *Sneed,* 96 U. S. 69;   *United States* v. *Jefferson Co.,* 5 Dill. 310;   *United States* v. *Lincoln Co.,* 5 Dill. 202;   *Corbin* v. *Com'rs of Washington Co.,* 3 Fed. Rep. 356;   *People* v. *Bond,* 10 Cal. 563;   *McCauley* v. *Brooks,* 10 Cal. 11;   *Smith* v. *Cleveland,* 17 Wis. 556;   *In re Kennedy,* 2 Rich. (N. S.) 216;   *Calhoun* v. *Calhoun,* 2 Rich. (N. S.) 283;   *White* v. *Hart,* 13 Wall. 646;   *Trustees* v. *Rider,* 13 Conn. 87;   *Regents* v. *Williams,* 9 Gill & John. 365;   *Canal Co.* v. *Railroad Co.,* 4 Gill & John. 1;   *Lapsley* v. *Brashears,* 4 Litt. (Ky.) 47;   *Golden* v. *Prince,* 3 Wash. 313;   *Edmonson* v. *Ferguson,* 11 Mo. 344;   *West R. Bridge Co.* v. *Dix,* 6 How. 507;   *Robinson* v. *Magee,* 9 Cal. 81;   *Planters Bank* v. *Sharp,* 6 How. 301;   *Walker* v. *Whitehead,* 16 Wall. 314;   *Green* v. *Biddle,* 8 Wheat. 1;

*Blanchard* v. *Russell*, 13 Mass. 1; *McCracken* v. *Hayward*, 2 How. 608; *State* v. *Commercial Bank*, 12 S. & M. (Miss.) 276; *Winter* v. *Jones*, 10 Ga. 190; *People* v. *Bond*, 10 Cal. 563.

*Thomas Wilson*, for the State, in reply.

1. If the law of 1881 is unconstitutional in part, it must wholly fail, for there is no part of the act that would have been enacted alone, if the legislature had foreseen that the courts would declare the remainder of the act void. *Slinger* v. *Henneman*, 38 Wis. 504.

2. The rule that the courts will not declare a law invalid unless clearly and manifestly so, rests on the presumption that the legislature did its duty, and passed on the constitutionality of the law before enacting it. Cooley on Const. Lim. 220, 222. But it appears on the face of the act of 1881 that the legislature refrained from thus exercising its judgment, and there is no foundation for the presumption or for the rule. And this case is within another rule, viz., that when, after the use of all legitimate lights it still remains doubtful whether any proposed action is warranted by the constitution, such action ought not to be taken. Cooley on Const. Lim. 88–9. And if it is doubtful whether, under the constitution, the tribunal has a right to perform the duties assigned to it by the act of 1881, it should decline to act.

Under the rule of presumption invoked by respondents, the amendment of November, 1860, must be held valid, unless the contrary clearly appears. It was approved by both the legislature and the people, and has received a practical construction and been recognized as valid in the several acts that have been passed, by which propositions for settlement of the bonds have been submitted to the people and voted on by them, and it has been unquestioned for twenty years.

The act of 1881, in terms proposed to submit to a special tribunal for decision, (1) the validity of the constitutional amendment, and (2) the constitutionality of the act itself. The legislature sought from the tribunal not advice, but a decision, and provided that it should make and file a decision.

3. There is no presumption in favor of the tribunal or its jurisdiction. The record must show its jurisdiction. *Chandler* v. *Nash*, 5 Mich. 409; *State* v. *Jersey City*, 25 N. J. Law, 309. This is not

v.29—33

done. The governor had no right to appoint district judges until the supreme court judges had declined "for some reason specially applicable to said court or the judges thereof," and the reasons for declining assigned by the latter judges are equally applicable to the district judges, for they too may be called on to act judicially in the matter submitted to the tribunal.

4. The counsel for the state insist (1) that the legislature cannot delegate to any person or tribunal any of its powers and thus absolve itself from the duties imposed on it by the constitution, and that this is an attempt to delegate to the tribunal the power to pass upon the question which the legislature ought to have passed on before enacting the law of 1881; (2) that as, by the constitution, all the judicial power is vested in the courts therein designated, the legislature cannot confer any portion of that power on any tribunal other than those designated in the constitution; and (3) that the act is in direct violation of the constitutional amendment of 1860.

We admit that respondents' position that the state, like an individual, may settle its disputes by arbitration, and may submit all questions of law or fact and be bound by the decree of the arbitrator or tribunal. The error of respondents is in confounding the state with the legislature, and assuming that because the state can thus act, the legislature can do the same. But the legislature is not the state. Sovereignty reposes not in them, but in the people alone. Legislatures are creations of the constitution, which is made and can be changed or omitted by the people, in their original sovereign and unlimited capacity. Potter's Dwarris on Stat. 337, 112, 66, 314–316.

The final construction of the constitution—the fundamental and supreme law—like the construction of all other laws is for the courts, and not for the legislature. If the legislature could decide finally on the constitutionality of the laws passed on it, there would be no check on the powers of the department of the government which, more than any other, stands in need of the restraints of the constitution. Federalist No. 78; Cooley on Const. Lim. 54, 55, 57; 3 Webster's Works, 29. And since the legislature is prohibited from finally construing the law or passing on its own powers, it cannot,

against the express command and limitation of the constitution, create a tribunal or other creature to exercise that function. Cooley on Const. Lim. 23, 24, 43–5; 1 Kent, 449–451; Potter's Dwarris, 317.

To say that the legislature may create a tribunal, or creature of its own, which alone may pass upon its powers, is to say there shall be no limits to its powers.

5. The respondents' proposition that the constitutional provisions we claim to have been violated do not apply to a case like this, where the state is a party—has no countenance in principle or authority. The language of the constitution is general, and the provision conferring upon the courts the power of finally expounding the constitution and passing on the constitutionality of legislation, and the powers of the legislature, was intended to protect the state—the whole body of the people—as well as individual citizens, against legislative encroachment and tyranny. Not content that the legislature in this act should disregard the declaration of the people (acquiesced in for twenty years) that no such law as this should be passed without a submission to the people, the respondents' counsel contend that the legislature may make the act effectual by creating a new tribunal in violation of another clause of the supreme law, which vests in the courts alone the exposition of the constitution and the laws.

*Murray's Lessee* v. *Hoboken*, 18 How. 272, cited by respondents, is directly against them; see pp. 275–284. *Western R. Co.* v. *De Graff*, 27 Minn. 1, and *State of Wisconsin* v. *Torinus*, 28 Minn. 175, and the various special laws appointing commissions to ascertain and report facts to the legislature, do not support the position that the legislature may appoint a tribunal or commission to conclusively expound the constitution, or pass on the validity of a law. Congress, it is true, provided a commission to adjust disputed claims at Geneva; but it does not follow that congress has power to appoint a commission to determine as to the validity of the 13th, 14th and 15th amendments.

6. The right of the legislature to pass conditional laws—laws to take effect on condition subsequent—is conceded. And, for purpose of argument, we may admit the validity of "local-option laws" so called. But none of the cases cited by respondents for those propo-

sitions sustain—indeed they are directly against—the position that the legislature may make a law depend, for taking effect, on the judgment of any man or body of men as to its constitutionality or expediency—that it can thus substitute the judgment of unauthorized persons for its own, and delegate to others its exclusive power to make laws. As well might the governor make a pardon or a death-warrant to take effect on the decision of some man or men—not the courts designated in the constitution. Cooley on Const. Lim. 141–152. See authorities cited by the attorney-general, and the following cases cited by respondents. *Locke's Appeal,* 72 Pa. St. 491; *State* v. *Parker,* 26 Vt. 357; and, also, *Slinger* v. *Henneman,* 38 Wis. 504; *Starin* v. *Town of Genoa,* 23 N. Y. 439, 448, 456; *Clarke* v. *City of Rochester,* 28 N. Y. 605, 632, 636; *Houghton* v. *Austin,* 47 Cal. 646; *Harrington* v. *Town of Plainview,* 27 Minn. 224. It makes no difference that the commission is composed of district judges. As members of it they do not act as judges, nor under oath. They are not even officers of the state, nor liable to impeachment or other prosecution for misconduct. If the legislature may appoint at all they may appoint whom they please, whether district judges, clergymen, hack-drivers or the bond-holders themselves.

7. The amendment of November 6, 1860, requiring any law making provision for payment of the interest or principal of the bonds to be submitted to the people, is not in violation of the clause in the federal constitution prohibiting the states from passing any law impairing the obligation of contracts. That clause merely prohibits obnoxious action—not non-action. It does not say how any law shall be passed, or with what formality. The state has the right to determine the prerequisites to the passage or operation of a law—that it must receive a majority or two-thirds vote of the legislature, or that it shall not become a law until submitted to and approved by the people. These are questions of state policy and expediency, to be determined by the state itself. Whether the legislature could, by contract, deprive the state of this right is not here in question. In the amendment under which the bonds were issued, the state made no such contract. That amendment was a contract of the state itself in its sovereign capacity. It left little or nothing for the legislature to

do about the contract. It pledged the faith and credit of the state, not of the legislature. This faith and credit of the state—of the people—the bondholders still have. If the people wish to vote the payment of the bonds, they will do so. If not they simply, as one party to the contract, refuse to perform according to the letter. And, if there is any breach of the faith and credit of the state, it would lie in that refusal and not in the constitutional amendment. The legislature is the mere agent of the people to express their will, and is bound to conform its action to the will of its principal; (*State* v. *Parker*, 26 Vt. 364;) and, if the amendment violates the federal constitution, it does so merely by denying to the servant or agent the power to disregard the sovereign will of the people, who are the state. The complaint is that the amendment secures to the state the right and power to express its sovereign will; but that is strictly in accordance with the contract. True, when the bonds are issued, a popular vote was not the usual mode of expressing the popular will in such cases, and a popular vote is more likely than legislative action to be adverse to the bondholders; but that only shows that it is probable that the legislature would not express the will of the people. The bondholders are entitled to nothing else than the will of the people of the state, and the state has a right to see to it that it shall not be misrepresented by its agent, and he who maintains the contrary maintains that the agent shall have a right to do wrong.

And not only has the state a right to insist on this, but the bondholders had reason to believe that some such amendment or guaranty that the will of the people should be obeyed, would be demanded and secured by the state. Except for ordinary expenditure, to be paid by annual tax, a two-thirds vote was required to contract any public debt, and the maximum of the allowable public debt was $250,000; (Const. art. 9, §§ 2, 5;) whereas, on the bonds proposed to be issued under the loan amendment, the annual interest would be $350,000. The bondholders had no right to believe that, when contracting a debt of such magnitude, the people would provide at least as carefully as they had before against undue influence with the legislature, or hasty and inconsiderate action. No one can say that the state bound itself not to do what its organic law showed it had deemed proper to do

under like circumstances. And, if this was true as to the intent, *a fortiori* was it true as to the principal. The state did not trust the legislature to make the contract, and it is not to be supposed it would leave itself without a direct voice in the adjustment of it. It is not reasonable to suppose the state would leave the legislature to adjust that immense sum, by majority vote, in any way it should deem fit.

And it is not only by money that it is proposed to adjust these bonds; and even if the amendment be invalid so far as taxation to pay the bonds is concerned, it clearly is not so as to the adjustment proposed by this act, which proposes to make a new contract with the bondholders. The people clearly have a right to say that any proposed new arrangement with the bondholders shall be submitted to them for approval. That does not impair the obligation of the old contract, if it had any, and of course does not interfere with the obligation of the new.

The constitutional amendment did not necessarily delay payment of interest. Until it was adopted, it was in the power of the legislature to make provision to pay the interest, and if it did not, it was merely because it would not. After the amendment was adopted, any law for payment of interest could have been submitted to the people and voted on within a few weeks, and certainly within the time required to levy a tax under a law not requiring such vote.

Every argument against the amendment resolves itself into this— that it renders it impossible to levy a tax against the will of the people; in other words, that it has made it impossible for the bondholders to obtain anything more than their contract called for, viz., the faith and credit of the state.

An inspection of sections 2 and 5 of article 9 of the constitution shows that they did not enter into the contract, and could not have been relied on by the bondholders, and the inapplicability to this increased indebtedness. And the amendment of 1858 shows that the payment of the interest was to come from a different source and one clearly specified in the contract. The public laws of a state which do not relate specially to such a contract do not enter into or become part of it, but may be amended or repealed at the pleasure of the legislature. *Tennessee* v. *Sneed,* 96 U. S. 69; *Beers* v. *Arkansas,* 20

How. 527; *Von Hoffman* v. *City of Quincy*, 4 Wall. 535, 553; *Swann* v. *Buck*, 40 Miss. 268, 296; *Woodruff* v. *Trapnall*, 10 How. 190, 203–207; 2 Kent, 462; 2 Story on Const. §§ 1383–5.

The amendment does not interfere with the bondholders' remedy, for it leaves them all the remedy the contract contemplated. They have the faith and credit of the state. Further, it has long been stated that persons buying the negotiable securities of a state have no legal remedy, but only a moral one which cannot be impaired by legislation. *Sunbury & Erie R. Co.* v. *Cooper*, 33 Pa. St. 278; *Bank of Washington* v. *State of Arkansas*, 20 How. 530; *Beers* v. *State of Arkansas*, Id. 527; *Hunsacker* v. *Borden*, 5 Cal. 288; *Sharp* v. *Contra Costa Co.*, 34 Cal. 284. The contract shows this is all they expected or contracted for in this case. The bondholders knowing that no legal remedy existed, entered into the contract relying solely on the moral obligation of the contract, and depending wholly on favor. *Volenti non fit injuria.* As in *Beers* v. *State of Arkansas*, there was no provision of contract that any law in force when the contract was made might not be repealed; and the constitution itself, as the bondholders knew, provided for its own amendment. The constitution forbids the impairing of the obligation of a contract on which there is a legal remedy. The question is not one of degree—the state cannot impair it at all. But that applies to the very contract, and not to the remedy, as the authorities cited clearly show.

8. There being no legal obligation and no legal remedy against the state, the case is not within the contract clause of the constitution, which relates only to civil or legal remedies. It does not protect from impairment the moral or natural obligation of contracts for the best of all reasons, that legislatures cannot impair that obligation. (Here counsel quoted at length *Blair* v. *Williams*, 4 Litt. (Ky.) 35, and *Lapsley* v. *Brashears*, Id. 47, and also cited *Edwards* v. *Kearzey*, 96 U. S. 595, 600; *Railroad Co.* v. *Tennessee*, 101 U. S. 337; *Louisiana* v. *New Orleans*, 102 U. S. 203, distinguishing moral from legal obligation and remedy, and holding that the only obligations and remedies protected are those which can be enforced *in invitum*, and are not left to the will of him on whom the obligation to perform rests.) Respondents quote from *Sturges* v. *Crowninshield*, 4 Wheat. 122, 197,

to show that when a party contracts, "the law binds him to perform his undertaking, and this is of course the obligation of the contract;" but they fail to show that the law binds the state, or that the state is otherwise than morally bound, and they persistently ignore the distinction between a moral and a legal remedy. Marshall, C. J., from whom the definition is quoted, says in the Dartmouth College Case, ǐ the same volume (p. 629,) that the contract clause "has never been understood to embrace other contracts than those which respect property or some object of value, *and confer rights which can be asserted in a court of justice.*" And see *Ogden* v. *Saunders,* 12 Wheat. 213, 300.

It is not the contract which is guarded by the constitution against impairment, but the obligation. In all the cases the right to legally enforce is a necessary and ever-present element of that obligation which the state is forbidden to impair. If an adequate or perfect legal remedy is not given, there is not, in the eye of the law, the constitutional obligation. Of course we admit the distinction taken in *Rees* v. *City of Watertown,* 19 Wall. 107, 124, between want of a remedy and inability to obtain the fruits of a remedy. And see *Ogden* v. *Saunders,* 12 Wheat. 213, 316–8. And therefore, the state being under no legal compulsion or necessity to pay—there being no legal means of enforcing against her the performance of such of her executory contracts as she may be unwilling to perform,—her declaration or enactment that she would not pay could not impair any obligation or affect any right. Such act would merely have the effect of non-action; and if, after it, the state did not pay, it would not be because of such act, but because she chose not to pay. The act would have no more effect than the declaration of an individual debtor who should declare that he would not perform his contract.

The respondents cite numerous cases to show that on such bonds as these, if issued by a natural person or a private or municipal corporation, they would have a legal remedy; and they argue that they have a right by virtue of their contract, and for every right there is a remedy. When there is a legal right there is a legal remedy, and there is no legal remedy against the state simply because there is not a legal, but a mere moral or natural right; and in this lies the differ-

ence between the contract of a state and that of a natural person or a private or municipal corporation.

The argument that the bondholders had a remedy before the legislature, and that such remedy by application there for relief was impaired by the amendment of 1860, proceeds on a misuse of the word. The authorities variously define "remedy" as "the legal means of enforcing," "the judicial enforcement," "enforcement in a court of justice," and the meaning in each case is the same. It is not within the power of the legislature to afford a "remedy," or to enforce a right under the law.

The suggestion that a power of sale in a mortgage is a remedy, is a misapprehension of the meaning of the word. Remedy is in the nature of cure or reparation. It follows a breach of contract, duty or law. It is a misnomer to speak of a remedy where there has been no disallowance or denial of a right. What is done in pursuance and performance of a contract cannot be a remedy, unless a party can at the same time be performing a contract and making reparation for a breach.

GILFILLAN, C. J.    April 15, 1858, the people of Minnesota adopted an amendment to the constitution, providing for the loan to certain railroad companies of bonds of the state, to be denominated "Minnesota State Railroad Bonds," to the amount of $5,000,000. They were to be payable to the order of the company to whom issued, transferable by the indorsement of the president of the company, and redeemable at any time after ten and before the expiration of twenty-five years from the date thereof, and were to bear interest at the rate of seven per cent. per annum. The faith and credit of the state were, in express terms, pledged for the payment of the interest and the redemption of the principal thereof. The amendment contained provisions for each company securing the state, and making provision for the punctual payment and redemption of the bonds, principal and interest, in such manner as to exonerate the treasury of the state from any advances of money for that purpose. These provisions for security operated only as between the state and the companies to whom the bonds were to be issued, and were not intended to affect the relations between the state and those who might become holders of the

bonds by indorsement, as in the amendment provided. To those persons the promise of the state to pay was to be absolute, creating between the state and them the relation of debtor and creditors. This was so decided—and it was the principal point involved and decided—in *Chamberlain* v. *St. Paul & Sioux City R. Co.*, 92 U. S. 299. A large amount of the bonds were issued pursuant to the amendment, when, the companies having abandoned further performance of the conditions on which the bonds were to be issued, the further issue of bonds was suspended. It is assumed that some if not all of the bonds issued were passed by indorsement to third persons, so as to become operative as contracts of the state to pay. For the purpose of this decision, it is assumed that such bonds were legally issued, for no question of their validity, nor of any equity of the state against them, . is made in the proceeding.

After the default of the companies to perform the conditions in the amendment imposed on them, and after it had become manifest that all intention to proceed with such performance was definitely aban doned by the companies, the people of the state, on November 6, 1860, by a large vote, adopted two amendments to the constitution proposed to them by the legislature, one of them expunging from the constitution the amendment of April 15, 1858, "excepting and reserving to the state, nevertheless, all rights, remedies, and forfeitures accruing under said amendment." The other amendment was in these words: "But no law levying a tax, or making other provisions for the payment of interest or principal of the bonds denominated 'Minnesota State Railroad Bonds' shall take effect or be in force until such law shall have been submitted to a vote of the people of the state, and adopted by a majority of the electors of the state voting upon the same." March 2, 1881, the legislature passed an act, the general purpose of which was to adjust, with the consent of the holders, the bonds outstanding, by taking them up and issuing in lieu of them new bonds of the state, for fifty per cent. of the amount which appeared by their terms to be due upon them. A notable feature of this act is that section 4 proposes the issue of the new bonds without submission to a vote of the people, and section 5 proposes it to be submitted to a vote of the people, the bonds to be issued only upon their ap-

proval; and it is left to the judges of the supreme court, or, in case they should decline to act, to an equal number of judges of the district court, to determine whether the legislature have power, without submitting it to the people, to make the contemplated adjustment; the bonds to be issued pursuant to section 4, or the proposition to be submitted to the people pursuant to section 5, according as the judges should determine the question submitted to them. The judges of the supreme court declined to act, and the governor called the respondents, judges of the district court, to act in their stead. The attorney general, on behalf of the state, now applies to this court for the writ of prohibition, to restrain the respondents from proceeding in the matter.

The writ of prohibition issues usually to courts, to keep them within the limits of their jurisdiction. But it may also issue to an officer, to prevent the unlawful exercise of judicial or *quasi* judicial power; and, the other reasons for it existing, we see none why it should not issue to a person, or body of persons, not being in law a court, nor strictly officers; as, if the legislature should assume in an unconstitutional manner to create a court of justice, and the person or persons appointed as its judge or judges should enter upon the exercise of the judicial functions thus attempted to be conferred, the same reasons might exist for arresting their action as exist in the case of a court exceeding its jurisdiction. The exercise of unauthorized judicial or *quasi* judicial power is regarded as a contempt of the sovereign, which may result in injury to the state or citizens. Three things are essential to justify the writ: *First,* that the court, officer, or person is about to exercise judicial or *quasi* judicial power; *second,* that the exercise of such power by such court, officer, or person is unauthorized by law; *third,* that it will result in injury for which there is no other adequate remedy.

The act of March 2, 1881, does not attempt to confer on the respondents judicial power in the strict sense of the term. It submits to their decision a judicial question, and, although their decision upon it could not have the authoritative and binding force of a decision by a court of justice, yet the act provides for carrying it into effect as though it were binding, thus giving it a *quasi* judicial operation.

That injury to the state and to the citizens will result, is apparent from the fact that such result will be the issue of invalid obligations of the state to the amount of millions of dollars, and, except this writ, there is no judicial remedy for the threatened evil. If the act is void, and so confers no authority on the respondents, the writ must issue.

Before proceeding to a consideration of the main questions involved in the case, we take pleasure in acknowledging the signal assistance which the arguments of the counsel on both sides have rendered to the court. The discussion took a very wide range, and occupied an unusual time, though not more than was profitably employed, and disclosed the most thorough and minute research and investigation. It has rarely been the good fortune of any court to have a cause before it so ably and exhaustively presented by counsel as this has been.

The basis of the application is the proposition that the act of March 2, 1881, is unconstitutional and void. It is claimed to be unconstitutional for various reasons, only two of which, on account of their superior importance, we think it necessary to consider. We state them in the order of their importance. They are—*First*, because it is contrary to the amendment to the constitution of November 6, 1860, to the effect that no law levying a tax, or making other provision for payment of the bonds, shall take effect till approved by a vote of the electors of the state; *second*, because it is an attempt to delegate to the judges legislative power inasmuch as it leaves it for them to determine whether section 4 or section 5 of the act shall be law.

In answer to the first of these positions, the respondents urge that the amendment of 1860, referred to, is itself void, because repugnant to the constitution of the United States. A more important and difficult question has rarely, if ever, come before a court in this country. Courts always regard it a matter of great delicacy to pass on the validity of an act of the legislature. It is much more so when the validity of a constitution adopted by the people of a state is called in question. Yet, when a law of a state is alleged to be contrary to some clause in the constitution of the United States, it is immaterial whether it was passed by the legislature, or by the people in framing a constitution for themselves. The constitution of the

United States is in some particulars a limitation or restraint upon the sovereign power of a state, and operates equally upon an attempt to exercise the prohibited power, whether by the legislature or the people. In both cases the attempt at exercising it stands upon the same footing, and must be judged upon the same principles.

One of the limitations imposed by the federal constitution is upon the power which it is assumed a state would otherwise have to legislate with respect to contracts. This it does by the clause which declares that no state shall pass any law impairing the obligation of contracts. It may be doubted that any other single provision of that constitution has had so beneficial and conservative an operation as this inhibition against improvident and unjust legislation, which might affect the life of business throughout the country. By it the great principle was established that contracts shall be inviolable. *Sturges* v. *Crowninshield,* 4 Wheat. 122. Probably no provision of the constitution has been more frequently before the courts, or more thoroughly and learnedly discussed, than this. There seems to have been doubt suggested at an early day that the clause applied to contracts made by a state. The question was first raised in the supreme court of the United States, in 1810, in the case of *Fletcher* v. *Peck,* 6 Cranch, 87. That was the case of a contract of a state—an executed contract—a grant of lands. The court held that the contract of a state is within the inhibition of the constitution, and said, (page 137:) "Since the constitution uses the general term 'contract,' without distinguishing between those which are executory and those which are executed, it must be construed to comprehend the latter as well as the former." In *Green* v. *Biddle,* 8 Wheat. 1, came in question the validity of two acts of the legislature of Kentucky, which were claimed to impair the obligation of a compact between that state and the state of Virginia. The objection that a contract made by a state is not protected by the constitution against legislation by the state seems to have been made, though, as the court said, it was not much pressed. Referring to the decision in *Fletcher* v. *Peck,* the court, (page 92,) said: "The principles laid down in that case are that the constitution of the United States embraces all contracts, executed or executory, whether between individuals or between a state and individuals; and that a

state has no more power to impair an obligation into which she herself has entered, than she can the contracts of individuals." The two acts of the legislature were accordingly adjudged repugnant to the constitution and void, because they impaired the obligation of the contract between the two states. The cases are important, as the judges who decided them, and defined the extent of the principles included in the decisions, were contemporaries with the constitution, or so nearly so that they knew well the evils in the past which the clause in question was intended to prevent for the future, and that repudiation by states of their own contracts was among such evils. Although there have been since those decisions very many cases in that court where the validity of state legislation, claimed to impair the obligation of state contracts, came in question, the court has never departed from nor limited the application of the principles laid down and applied in those two cases. Nor are we aware of any intimation by any judge of that court that contracts of a state, either executed or executory, are not, as fully as any other contracts, embraced within the constitution. As lately as the case of *Meriwether* v. *Garrett*, 102 U. S. 472, decided in 1880, the court said, (p. 520:) "The federal judiciary has never failed, so far as was in its power, to compel the performance of all lawful contracts, whether of the individual, or of the municipality, or of the state. It has unhesitatingly brushed aside all legislation of the state impairing their obligation."

The relator does not deny that there may be a contract of a state, the obligation of which the state cannot impair. He admits this as to contracts which are executed,—as, for instance, grants,—and also admits it as to an executory contract, to enforce which against the state the other party has a perfect judicial remedy. But he claims that executory contracts of a state, which the state cannot be compelled by judicial means to perform, (and this includes all those, the performance of which rests with the legislature, or with some state officer over whom the judiciary has no control in the matter,) have no obligation, within the meaning of the constitution of the United States, and are, therefore, not embraced in its prohibition. His propositions are, in brief, these: *First.* It is legal obligations, and not merely moral obligations, which the constitution aims to protect.

*Second.* The legal obligation of a contract consists in the right to judicially enforce it. Where that right is wanting, there is no legal obligation. *Third.* Consequently, executory contracts of a state, which cannot be judicially enforced—and such are these bonds—are not within the constitutional protection.

If it be true that there is no legal obligation to a contract where there is no judicial remedy to compel the defaulting party to perform it,—that is, if the legal obligation and a perfect judicial remedy directly against the party to enforce the contract be synonymous,— then most executory contracts of a state are at the mercy of the state that made them, the bonds here in question are in that predicament, and subject to any legislation the state of Minnesota might choose to make with regard to them. The proposition, if conceded and followed to its necessary logical consequences, will lead to results somewhat startling. State executory contracts to pay, like similar private contracts, are not protected by the federal constitution, except as to the legal obligation. If there be no legal obligation to them, the state that made them may at its pleasure annul them, and there can be no reason why one state cannot annul the executory contracts of another, or so legislate as to destroy any market value which they might otherwise have within its jurisdiction. Indeed, they are not in a legal sense contracts at all, have no value as such which the law will recognize, are not to be regarded as property, and all the hundreds of millions of federal and state bonds which are regarded as property by the financial world, are in law merely pieces of worthless paper.

What constitutes the legal obligation of a contract has been much discussed by courts and text-writers almost ever since the adoption of the federal constitution. Some have insisted that it is the judicial remedy given to enforce the contract; that the legal obligation consists of and is precisely co-extensive with such remedy, and that those agreements from which a judicial remedy is withheld, have merely moral, or, as they are sometimes termed, imperfect obligations. Others have insisted that the legal obligation of the contract is entirely distinct from the remedy to enforce it, and may exist without it. The latter seems to be the opinion recognized in the supreme court of the United States. The acts of state legislatures claimed to impair the

obligation of contracts, that have come before that court, have generally been acts relating to remedies, and some judges of the court, in endeavoring to show the importance of the remedy to the obligation of the contract, and that the remedy cannot be taken away without impairing the obligation, have employed expressions which, severed from the connection in which they were used, may be understood as indicating that without a judicial remedy there can be no legal obligation. Such expressions are quoted and urgently pressed on this court by the relator. As applied to the vast majority of contracts, such expressions are correct, for, as a general rule, wherever the law recognizes an obligation, it gives a judicial remedy to enforce it. But there are exceptions, as, generally, in the case of state contracts, where, without ignoring the obligation, and without regard to the validity or nature of the contracts themselves, the law, from motives of public policy, exempts the party from direct judicial action to enforce them. When read with their context and in view of the subject-matter then in hand, the expressions referred to cannot be understood as denying the obligation of these latter contracts. They must be understood as referring to those agreements or obligations—such as nude pacts, or obligations to exercise gratitude, benevolence, and the like—of which the civil law takes no account, and not to those contracts which courts will recognize, whenever they have an opportunity, by the presence before them of parties claiming rights or exemption under such contracts. But since the great cases of *Sturges* v. *Crowninshield*, 4 Wheat. 122, and *Ogden* v. *Saunders*, 12 Wheat. 213, the accepted doctrine of that court has been that the legal obligation and the remedy are distinct. Referring to this matter, the supreme court, in *Von Hoffman* v. *City of Quincy*, 4 Wall. 535, said, (p. 554:) "If these doctrines were *res integræ*, the consistency and soundness of the reasoning which maintains a distinction between the contract and the remedy—or, to speak more accurately, between the remedy and the other parts of the contract—might, perhaps, well be doubted. But they rest in this court upon a foundation of authority too firm to be shaken; and they are supported by such an array of judicial names that it is hard for the mind not to feel constrained to believe they are correct."

That the legal obligation of contracts, and judicial remedy or means provided by law to enforce them through action of the courts, are distinct, appears most in accordance with reason. It is unreasonable that the obligation of a contract is something shifting, and not permanent; that in the same contract it may exist at one time and be absent at another; that at different times the same contract may have and not have a legal obligation; that it may not have such obligation when made, but may, from accident or change of circumstances not connected with it, subsequently acquire it; that it may have it when made, but subsequently lose it. Certainly, the legal obligation, in whatever metaphysical reasoners may place it, must belong to the contract so long as it continues, from the time it is made till it is performed, and even, as decided in *Fletcher* v. *Peck*, after it is performed, though then the remedy to enforce its performance has ceased. But there is not always a remedy, certainly not always a judicial remedy, for contracts acknowledged to be valid. A contract between independent nations has a binding force and obligation which is universally acknowledged, and which has never been doubted among civilized nations; yet there never can be a judicial remedy in behalf of one nation against another. The only remedy in that case is in the right of war.

So in the case, put by way of illustration in *Ogden* v. *Saunders*, of two men thrown together upon a desert, uninhabited island, and making a contract for exchange of commodities. It is difficult to suppose any one could deny that the duty and obligation of each to do what he had stipulated to do, and the right to demand what the other had stipulated to perform, would be as complete as though they had made the contract in a country governed by law; yet, so long as they remained on the island, the only remedy either would have to compel performance by the other would be a resort to force. If, however, before the contract was performed, they should both remove to a country governed by law, there would then spring up the judicial remedy provided by the laws of that country upon contracts of that kind.

The cases of *Rees* v. *City of Watertown*, 19 Wall. 107, and *Meriwether* v. *Garrett*, 102 U. S. 472, present instances where judicial

v.29—34

remedies once existed, but ceased before the contracts were performed. For the court, though recognizing the legal obligation of the contracts, was forced to acknowledge utter inability to afford any remedy. Had the cause from which the remedies in those cases ceased to exist been subsequently removed, they would have presented instances of contracts as to which there at first were judicial remedies, then for a time no remedies, then again the remedies restored. Upon a con- tract creating a debt payable in money, if the debtor have no prop- erty out of which the debt can be made, there is practically no judicial remedy. In case of the death of a debtor, there is no such remedy till the appointment of an administrator or. executor.

Mr. Story, in his work on the constitution, gives, as instances of legal obligations existing where there is no judicial remedy to enforce them, the case of a contract by a state, which does not permit its citizens to sue it, with one of its citizens, and of a contract between the United States and one of its citizens, as to which he says no one would doubt their legal obligation. And here we may say that, al- though there have been before the supreme court of the United States very many cases in which contracts by a state came more or less in question, and in some of which, especially in *Railroad Co.* v. *Tennessee*, 101 U. S. 337, and *Railroad Co.* v. *Alabama*, Id. 832, it was held there was no judicial remedy to enforce the performance of the con- tracts, there is no case to which our attention has been called where it was even suggested that a contract of a state has not, within the meaning of the federal constitution, the same legal obligation as a similar contract of an individual. In one of the latest cases before it, it said: "States and cities, when they borrow money and contract to repay it with interest, are not acting as sovereignties. They come down to the level of ordinary individuals. Their contracts have the same meaning as that of similar 'contracts between private persons." *Murray* v. *Charleston*, 96 U. S. 432, 445. A citizen may, upon one of its contracts, sue the United States in the court of claims; a state may sue another state for a debt in the supreme court of the United States; some of the states permit suits to be brought by citizens upon claims against them, in their own courts; and in all these cases the courts may proceed to decision and judgment; but the courts

cannot in such cases—ordinarily, at any rate—enforce a judgment for money, for they have no power to coerce congress or the legislature of the debtor state to proceed by appropriation and levy of taxes to provide money for payment of the judgment. There is, therefore, in such cases, notwithstanding the right to sue, no judicial remedy, for, as decided in *Railroad Co.* v. *Tennessee* and *Railroad Co.* v. *Alabama*, a judicial proceeding which stops short of enforcement is not a judicial remedy. But can any one imagine that in any of the cases mentioned the court would decline to render judgment for the debt, on the ground that there was no perfect judicial remedy to enforce it? Yet why should it not in all those cases render judgment for the United States or the state, if it be true that there is no legal obligation where there is no judicial remedy to compel performance of the contract. A court tries and determines no questions but those of legal rights; it has nothing to do with mere moral or imperfect obligations, the binding force of which the civil law does not take into account. A court of law does not create a legal obligation; it only declares and adjudges what the legal obligation of the contract sued on is; that is, what are the legal rights and duties of the parties under their contract. To appoint courts to try and determine, according to rules of law, cases of contracts on which there can be no legal obligation, would be a grave absurdity. In *Fletcher* v. *Peck*, 6 Cranch, 87, Chief Justice Marshall, discussing the question whether a contract made by a state is protected by the federal constitution, supposes the case of a suit brought against a state on its contract, and says, (p. 139:) "Would it have been a defence in such a suit to say that the state had passed a law absolving itself from the contract? It is scarcely to be conceived that such a defence should be set up."

Originally a citizen of one state could sue another state in the supreme court of the United States. This was decided in an action on a contract, the case being *Chisholm* v. *Georgia*, 2 Dallas, 419. If that right to sue had secured a judicial remedy, then, if the proposition of the relator be true, this singular result must follow: that if a state made a contract with one of its citizens it would have no legal obligation, and would not be protected by the federal constitution, be-

cause of the want of a judicial remedy upon it; but when the citizen should become a citizen of another state, a judicial remedy would spring up and a legal obligation attach to the contract, and adhere to it, unless he should return to his original state. The proposition that the legal obligation to do a thing which the party has agreed to do does not exist where he cannot be compelled to do it by a judicial proceeding, makes the obligation to do it depend on the right and power of the court to compel him; whereas, the right and power of the court to compel the act logically depend on a pre-existing obligation of the party to do it. The conclusion at which we arrive as to the legal obligation of a contract is that it consists in the right on the one side and corresponding duty on the other, that, according to the law in force at the time, are created by the stipulations of the parties; that it arises as soon as the contract is made, and continues until it is fully performed, and may even continue afterwards, and may exist although there be no judicial remedy upon it; that the the remedy, though not essential to the obligation, gives it value, so that to take away the remedy or seriously lessen it will impair the obligation. Mr. Story, in his work on the constitution, section 1385, says: "The obligation to perform a contract is coeval with the undertaking to perform it. It originates with the contract itself, and operates anterior to the time of performance. The remedy operates upon the broken contract, and enforces a pre-existing obligation." And, section 1381: "There may exist a perfect obligation in contracts where there is no known and adequate means to enforce them."

Thus far we have assumed a judicial remedy upon a contract to imply only a direct judicial proceeding against the party to compel him to perform its stipulations. But the term in its largest sense comprehends something more than this. It comprises, also, judicial protection against invasion by others of the rights vested by the contract. If the rights so vested are such as the law will, in case of such invasion, recognize and protect, then there is a judicial remedy belonging to the contract. In the case of executory contracts with the state, the state might assail the rights of the other party to the contract, either by a suit in disregard of its contract, or in some other

mode. As an illustration of an assault by the state, through suit, upon. the rights of the other party, and an opportunity and judicial means afforded to vindicate his rights which no immunity on the part of the state could prevent, we will suppose a case that might have arisen with respect to these bonds. Suppose that, disregarding the amendment of 1860, the legislature had appropriated money to pay the bonds, and it had accordingly been paid to the holders of them, and that thereupon the state·had brought suit against such holders to recover the money as wrongfully paid and received; their rights under the contract would then have been directly before the court for adjudication and enforcement or protection against the claim made by the state.

To show how the party contracting with the state might have judicial protection against an attempt by the state through other means than a suit to invade or disregard his rights, suppose the case of a contract by the state to convey land. This state has many such· contracts outstanding. Suppose the state should assume to annul one of these contracts, and afterwards convey the land to some other person having notice of the first contract. There would be a very complete and effectual judicial remedy in such case for the first purchaser. Many instances like this are to be found in the books. Others than the state might violate the rights acquired under an executory contract with the state. As in case of these bonds, a wrong-doer might convert one of them. In that event, would not the contract of which the bond was the evidence be the reason or occasion for a perfect judicial remedy against the wrong-doer? Would not such contract, rather than the paper on which it was printed, be the chief consideration fixing the damages to be recovered? The bonds are contracts, the obligation of which cannot be impaired by state legislation.

The objection made to the amendment of 1860 is that it impairs the obligation of these contracts; and it is claimed that the power and duty of the legislature to provide by levy of taxes, or by the appropriation of other funds, vested in and imposed on the legislature when the bonds were issued, was the remedy upon them, and the amendment impairs their obligation by destroying the remedy; that the exercise of such power and duty by the legislature having been

contemplated by the parties—the state on one side and those who received the bonds on the other—as the means, and only means, through which they could and would be paid, and as the bonds were received with the understanding that such means should be employed, it became a part of the contracts—as much as though expressly stipulated therein—that the legislature should have and exercise that power; and that the amendment annuls that condition of the contracts, and so impairs their obligation. The consideration of these propositions involves, as preliminary to them, these questions: Can the power and duty of appropriation, and levy of taxes to provide the funds needed for appropriation, be regarded in law as a remedy upon state obligations? And can the state irrevocably bind itself by contract to employ its sovereign power of taxation?

It has been insisted on the part of the relator that the only legal remedy there can be to enforce a contract is the judicial remedy; that is, the enforcement of it through proceedings in a court of justice. That is the usual remedy, and the exceptions are so rare that, in speaking of the remedy, the judicial remedy is usually intended. But there may be other remedies than judicial ones. One of the remedies by act of the party aggrieved, enumerated by Blackstone, book 2, c. 1, is that of distress for rent, which existed at the common law and was regulated by statute, by which the landlord might seize and sell the tenant's property to enforce payment of the rent. Another non-judicial remedy is the right of a pledgee to sell the property pledged for payment of the debt for which it is pledged. Another is the power of sale contained in mortgages or trust deeds, where they are permitted by the law of the state. This power of sale is not the principal contract. The principal contract in such case is the agreement creating the debt and the security. The power of sale is given only to enforce the debt against the property constituting the security. And, in general, we may say that any means in the hands of the party aggrieved, or of any other person, though not a court, for enforcing performance of a contract,—any mode of enforcing it agreed on by the parties, if recognized and permitted by the law,—is a legal remedy; and where the power of administering a remedy is lodged by law with any person or body, especially if the duty to administer it

is also imposed, that constitutes a legal remedy. This would include the legislative power and duty to provide means to pay and to pay state or municipal debts. It is argued that this is inconsistent with the proper definition of a remedy, which implies compulsion on the defaulting party; that there can be no such thing as compulsion by a party upon himself; that when he acts in the matter the act is voluntary, and according to his own will and pleasure, and not from enforcement. The argument is sound when applied to an individual. But is it so when applied to the case of the complex body, the state? It is admitted that there are cases where there is a complete, direct judicial remedy against the state. The existence of it is admitted in all those cases where the power and duty to perform a contract on the part of the state rests with an officer of the state, and the courts can, by *mandamus* or otherwise, compel him to perform it. From the many instances found in the books, of state courts enforcing judicial remedies, against the state upon its contracts, we will refer to two: In the case of *McCauley* v. *Brooks*, 16 Cal. 11, the state of California had entered into a contract with a private person which required the periodical payment of money by the state to such person. The legislature passed an act appropriating money in the state treasury to meet the demands of the contract, and directing the state comptroller to draw his warrants on the treasurer for the instalments as they should fall due. A subsequent act of the legislature forbade the comptroller to draw his warrants, except upon the approval of a board of examiners. Pursuant to this act, the comptroller refused to draw his warrants for the instalments, without the approval of that board. The contractor applied to the supreme court of the state for a *mandamus* to compel him to draw them, and the court granted the peremptory writ, thus enforcing against the state a complete judicial remedy. Though in form against the comptroller, it was in substance against the state; for it was the money of the state, and not of the comptroller, which it reached. The other case is *St. Paul & Chicago Ry. Co.* v. *Brown*, 24 Minn. 517. There the state of Minnesota had granted or contracted to grant certain swamp lands to the railway company, and a subsequent act of the legislature had appropriated the same lands to certain state institutions, and for that purpose had

vested the nominal title in trustees, the defendants in the suit. The legislature consented to a suit against them to test the validity of its appropriation of the lands, and the suit was brought. The court treated it as an action against the state, saying, (p. 574:) "The subject-matter of the action is property belonging to the state, and the action, though nominally against the trustees, is virtually against the state, to determine its right in the property involved." It also held that the judgment might enforce itself by passing or confirming the title.

The proposition that when the legislature employs its authority to bring about performance of a state contract, it is the state itself which acts, and that the act is therefore voluntary and not remedial, may be stated with as much propriety of the state judiciary when it administers a judicial remedy against the state. For the judiciary is not superior to nor independent of the state. It is, as the legislature is, only a branch or department of the state government. It exercises, as does the legislature, only a part of the sovereign power of the state. It is true that the action of the legislature within its proper sphere is the action of the state. But it is equally true of the action of the judicial and executive departments, acting within their respective proper spheres. Though each exercises the sovereign power of the state belonging to its department, neither of them is the state, nor do they all together constitute it. They are the instrumentalities appointed by the state to govern it—to employ its sovereign power, and control its actions. Nor do the people constitute the state, though it exists for their benefit, and is maintained by their means. A people without any political organization, without any government, is not a state. The people are only an element of the state. When, within prescribed territorial limits, they effect a political organization and establish a government, a state arises. The government is established to protect them from external wrong and internal disorder. In this organization and government what is called sovereign power rests. Under American organization it does not all reside in any one department, but is distributed among them, each wielding the portion vested in it, as well against the body of the people as against individuals. Each exercises within its proper

sphere compulsive force. The acts of the legislature have as much binding force, not only on individuals, but on the entity called the state,—the people within the proper territorial limits as an organized political society,—as do the decisions or judgments of the courts.

Whether a court may exercise the power entrusted to it against the state, and, if so, to what extent, depends on what the people, in distributing the governmental power by means of the organic law or constitution, deem expedient. To what extent the legislature has entrusted to it power and the duty of administering remedies in favor of state creditors depends also on the same thing. When the legislature, by law, directs the treasurer of the state to pay to its creditors money of the state in the treasury, how does that differ, so far as compelling the state is concerned, from the case of a court, if the public policy of the state permitted it, directing the same officer to pay the same money to the same creditor? Or, if the constitution placed it within the judicial power—and there is no reason, except of expediency, why it might not—to lay and distribute the burden of a state debt upon the taxable property within the state, how, so far as regards compulsion of the state, would the action of the courts in doing it differ from that of the legislature in levying and distributing a tax upon the same property for the same debt? In such cases the action of the legislature and the action of the judiciary would be equally compulsive, though in the one case it would be legislative, and in the other judicial, action. That where the legislature acts its commands are executed by one set of officers, and where the judiciary acts its commands are executed by another set, could make no difference so far as the power is to be deemed compulsive or not. The exercise of power to do is always compulsive; so, if judicial action in favor of a creditor is a remedy because it is compulsive, legislative action for the same purpose is also, for the same reason, a remedy. It is true, the legislature is independent of the other departments, and there are no means to compel it to perform its duties and exercise its power. It is equally so with the judiciary. Each has its duty to perform. The duty is as imperative upon the one as upon the other. We see no reason, therefore, why the power and duty

vested in and imposed on the legislature to provide for payment of a state debt is not a remedy, or means of remedy, as much as the power and duty vested in and imposed on a court to enforce payment as between private persons.   It may not be, and, as a fact, is not, equally valuable with a judicial remedy; but this is due rather to the difference in the composition of legislatures and courts, and in their modes of procedure, than to the difference in the powers entrusted to them.

It is sometimes difficult to say whether a law operates directly on the contract to change its terms, or upon the remedy to regulate or vary that.   It is so here; for it may be a question whether it did not enter into and become a term or condition of the contract, as much as though expressed in the bonds, that the legislature of the state should provide and appropriate money for their payment; and, if there were no other funds available for the purpose, should provide them by the levy and collection of taxes.   Of course a state can bind itself to pay money, and it must follow that it can bind itself to provide the funds by the means necessary for that purpose.   It may irrevocably bind its taxing power.   We are speaking now of the state, not of the legislature.   The power of that department to bind the state in the matter of taxation will necessarily depend on the authority conferred on it by the constitution.   Its authority in that regard need not be considered here; for, if the taxing power was bound at all in respect to these bonds, it was done by the state in the constitution.   A state may, by contract, irrevocably bind itself not to exercise, or may irrevocably limit the exercise of, its power of taxation.

In the case of *State of New Jersey* v. *Wilson,* 7 Cranch, 164, the colony of New Jersey, in 1758, by contract, pursuant to an act of its legislature, conveyed certain lands to or for the use of the Delaware tribe of Indians.   In the act authorizing the contract it was provided that the lands "shall not hereafter be subject to any tax, any law, usage, or custom to the contrary thereof, in anywise, notwithstanding."   In 1801, an act of the legislature of the state, without mentioning the subject of taxes, authorized the lands to be sold, and they were accordingly conveyed to other persons.   In 1804, the legislature passed an act repealing so much of the act of 1758 as exempted the lands from taxation.   The supreme court of the United States con-

strued the clause in the act of 1758 exempting the lands from taxation to be a contract, and held that the act of 1804 impaired its obligation, within the meaning of the federal constitution, and was, therefore, void.

In the case of the *State Bank of Ohio* v. *Knoop*, 16 How. 369, an act of the legislature of Ohio, passed in 1845, under which the bank was incorporated, provided that any bank incorporated under it should pay to the state semi-annually six per cent. on the net profits of its business, "which sum or amount so set off shall be in lieu of all taxes to which the company, or the stockholders therein, would otherwise be subject." In 1851, the legislature passed another act, providing that the capital stock of banks incorporated under the laws of the state should be taxed for the same purposes, and to the same extent, that personal property was or might be required to be taxed, in the place where such banks should be located. The effect of this was to increase the rate of tax upon this bank. It was urged in the supreme court of the United States, in support of the right to change the mode and rate of taxation, that the power to tax is a sovereign power, and that a state cannot barter away any part of its sovereign power. But the court held that the exempting of certain property from taxation is not a relinquishment of a sovereign power, and said, (p. 384:) "The taxing power may select its objects of taxation, and this is generally regulated by the amount necessary to answer the purposes of the state. Now, the exemption of property from taxation is a question of policy and not of power," and, (p. 390,) "the vague and undefined and indefinable notion that every exemption from taxation or a specific tax, which withdraws certain objects from the general tax law, affects the sovereignty of the state, is indefensible." The court held a state may, by contract, bind itself in a particular case not to tax, or to do it in a particular way, and, upon the binding force of a contract by the state, quoted with approbation the language of the court in *Dartmouth College* v. *Woodward*, and of the supreme court of Ohio, in *State* v. *Com. Bank of Cincinnati*, 7 Ohio, 125, 129, that "a contract between the state and individuals is as obligatory as any other contract." The court, therefore, held that the act of 1845 constituted a contract between the state and the banks, which organ-

ized under it, to tax them only in the manner and to the extent therein expressed, and that the state could not revoke it.

*Dodge* v. *Woolsey*, 18 How. 331, was of a similar character, except that it presented a case where a constitution, adopted subsequently to the incorporation of the bank under the act of 1845, prescribed a rule of taxation upon such bank different from that agreed upon in that act. The doctrine of the case in 16 Howard was reaffirmed, and it was held that a constitutional provision was equally ineffectual with an act of the legislature to affect prior contracts of the state. In *McGee* v. *Mathis*, 4 Wall. 143, the United States had granted, in 1850, to the state of Arkansas, swamp and overflowed government lands, on condition that the lands, or the proceeds of them, should be applied in reclaiming the lands for cultivation by means of levees and drains. The state accepted the grant, and its legislature, in 1851, passed an act providing that the lands should be exempt from taxation for ten years, or until they should be reclaimed, and for the sale of them by the issue of transferable scrip, receivable for any of the lands not previously taken up, to be selected by the holder. After the issue of scrip pursuant to the act, another act was passed, in 1855, repealing the section in the act of 1851 which exempted the lands from taxation, and making provision for taxing those sold or to be sold, precisely as other lands; and also, in 1857, another act was passed authorizing a special tax upon the lands. It was held that the act of 1851 constituted a contract between the state and the holders of the scrip issued under it that the lands should not be taxed for ten years, or until the lands should be reclaimed, and the state could not impair the contract by subsequent legislation, and the repeal of the exemption was void.

There are many other cases in the reports of the decisions of the supreme court of the United States involving the same question, and in all of them the rules laid down in the cases we have specifically referred to were followed. Although some of the judges have expressed doubts on the power of a legislature, by virtue merely of its general legislative authority, to make an irrevocable contract binding the state not to exercise, or limiting its exercise of, the taxing power, that the state can make such contract, and that when made it is

irrevocable by act of the state alone, is the accepted doctrine of that court. We have confined our references mainly to the decisions of the supreme court of the United States on this point, and on others involved in the general question of the validity or invalidity of the constitutional amendment of 1860, because the decisions of state courts, while they may be valuable for the reasons given in support of them, are not of any authoritative or binding force upon this court. But the supreme court of the United States is the final arbiter of the question whether a state law is repugnant to the constitution of the United States, and on all such questions we are bound to follow its decisions.

The proposition that a state may, by contract with an individual, obligate itself beyond its power of revocation to abstain from use of its taxing power, would seem to require the converse, that it may likewise so obligate itself to use that power. There is no case that we are aware of where the question arose whether the state, as an entirety, in its organized capacity as a body politic, may be so bound. Those which come nearest to it are the cases of municipal corporations. These bodies are subdivisions or instrumentalities of the state government, established for the administration of the government in matters of local concern, and vested with a portion of the sovereignty of the state, to be exercised in such matters. In respect to these subdivisions of the state, where they have the power of taxation to meet the demands of contracts, they may, by entering into such contracts, not only bind themselves to exercise the power, but bind the state, so that it cannot withdraw the power till the contracts are satisfied.

In the case of *Von Hoffman* v. *City of Quincy*, 4 Wall. 535, the legislature of Illinois authorized the city of Quincy to issue its bonds, bearing interest, and to levy and collect a special annual tax upon the property within the city sufficient to pay the annual interest upon the bonds which should be issued. The tax was to be applied to payment of the interest, and to no other purpose whatsoever. The bonds were issued, and subsequently, in 1863, the legislature passed an act which repealed all former laws touching the levy or collection of taxes on property within the city, except those regulating the collection and as to taxes relating to streets and alleys, and which prescribed the

purposes for which taxes might be levied, and limited the amount for each purpose. The rate authorized to be levied to pay the debts and meet the general expenses of the city was so low that the amount which could be realized would not be sufficient to pay the debts and current expenses of the city, and so the interest on the bonds could not be paid. The court held the repealing act of the legislature void as to the bonds, as impairing the obligation of the contract, and said (p. 554:) "It is well settled that a state may disable itself by contract from exercising its taxing power in particular cases. It is equally clear that where a state has authorized a municipal corporation to contract and to exercise the power of local taxation to the extent necessary to meet its engagements, the power then given cannot be withdrawn until the contract is satisfied. The state and the corporation are in such cases equally bound. The power given becomes a trust which the donor cannot annul, and which the donee is bound to execute; and neither the state nor the corporation can any more impair the obligation of the contract in this way than in any other. The laws requiring taxes to the requisite amount to be collected, in force when the bonds were issued, are still in force for all the purposes of this case. The act of 1863 is, so far as it affects these bonds, a nullity. It is the duty of the city to impose and collect the taxes in all respects as if that act had not been passed."

In *City of Galena* v. *Amy*, 5 Wall. 705, the same principle was recognized.

In *United States* v. *New Orleans*, lately decided, an abstract of the decision being given in 13 Chi. Leg. News, 207,* it was held that an act of the legislature limiting the power of a city to levy a tax, which it had at the time when it issued its bonds, without providing other adequate means to pay the bonds, impairs the obligation of the contract and is void.

The principle was recognized in *United States* v. *County Court*, in the United States circuit court for the eastern district of Missouri, 2 Fed. Rep. 1. The court said: "A legislative act which assumes to repeal any tax law in force when relator's bond was issued, and under

*Since reported as *Wolff* v. *New Orleans*, 103 U. S. 358.—[Reporter.

which he was entitled to enforce payment, is, as to him, unconstitutional and void." In *State* v. *Common Council of City of Madison,* 15 Wis. 30, it was held that a prohibition to levy a tax to pay a city debt was a destruction of the remedy, and the legislature had no power to do it. It would seem as though, if the state can confer on these subdivisions authority to bind its sovereign power of taxation, so far as they are concerned, it may itself bind that power so far as concerns the whole state.

There is, of course, always a difficulty in comprehending the idea of any one, state, municipality, or individual, being bound, where there is no external power to maintain and enforce the obligation. In the case of municipalities and of individuals, it is easy to concede that they are bound, because the judicial power extends to them; and it is so of a state obligation, whenever it comes before a court to maintain it. But of those state obligations which can be carried out only by legislation, which can rarely be brought within the reach of judicial power, and never directly for the purpose of compelling their performance, it is more difficult to conceive a power external to the state which may enforce them. The difficulty, more apparent than real, arises from confounding the state with one of the departments of its government, the legislative, which department the state has appointed to enforce state obligations in certain cases. As soon as it is understood that the legislature is not the state any more than the judiciary is, and that, like the judiciary, there is entrusted to it the power, in cases coming within its proper sphere, of enforcing state obligations, the difficulty of accepting the idea that there is a binding force to such obligations ceases. Whenever any undertaking of the state—as, for instance, the undertaking to use the taxing power —comes in question before a court, it is the province and duty of the court to recognize it, and, so far as required by the case before it, to maintain its integrity. But it is ordinarily the province and duty of the legislative department to directly enforce the obligation in the first instance, and of the courts to sustain its action, when its validity comes in question in a case properly before them. As, in the case before us, if there was a binding obligation of the state to use the power of appropriation and taxation, and if the amendment of 1860

impairs that obligation, then it was still the duty of the legislature, to whom the power is entrusted, to employ it; and whenever, in case it should employ it, the legality of its action should, as it might do, come before the judiciary, it would be the province and duty of the latter department to sustain and confirm the action of the former.

Having reached the conclusion that there rests on the state a legal obligation to perform its contracts; that, where the power and duty to bring about performance of them are in the legislative department, there is a legislative remedy, the destruction of which may impair the obligation of the contract, as the taking away a remedy within the power of the judiciary may; and that the state may, by contract, disable itself to abolish or fetter the power of legislative appropriation and taxation, where they constitute the means to perform its contracts, it remains to be considered: Did the state, by its contract with the bondholders, bind itself to leave the power in the ordinary legislative body? and did the amendment of 1860 lessen the value of the creditors' remedy, when it removed the power of providing for payment of the bonds from the ordinary legislative department, and remitted it to the electors at large? And here we may refer to a suggestion which has been made, that the undertaking of the state was general to pay the money, and was not a promise to employ any particular means for payment,—for instance, taxation,—and that legislation affecting only particular means of payment, or a particular mode of payment, does not impair the integrity of the general promise to pay. The amendment takes from the legislature the power to employ any means of payment, by taxation or otherwise. Even though the treasury might have in it millions of unappropriated and unneeded funds, it could not, according to the amendment, pay a cent of such funds upon this debt. The proposition would be absurd that a legislative act leaves a contract to pay money unaffected, if it do not prohibit the debtor to pay, but only disables him to employ the only means through which he can pay. The debtor's promise to pay is usually general; it is rarely a promise to pay only from a particular fund, as from his personal property, or from his real estate. But could any one say that a law which should put it out of his power to appropriate his personal property, or his real estate, to pay a gen-

eral debt, would leave his contract to pay unimpaired? By contracting this debt, the state put itself under an obligation to resort to taxation. to pay it; certainly, if it provided no other funds with which to pay. The obligation to pay implies an obligation to employ the means necessary for payment. The observation of the supreme court of the United States in *Loan Association* v. *Topeka*, 20 Wall. 655, 660, though in that case applied to a municipal corporation, is equally applicable to the state, "that all contracts creating debts to be paid in the future, not limited to payment from some other source, imply an obligation to pay by taxation."

At the time the bonds here in question were issued, the constitution of the state—the same instrument pursuant to which they were issued—provided, (section 2, art. 9:) "The legislature shall provide for an annual tax sufficient to defray the estimated expenses of the state for each year; and whenever it shall happen that such ordinary expenses of the state for any year shall exceed the income of the state for such year, the legislature shall. provide ·for levying a tax for the ensuing year, sufficient, with other sources of income, to pay the deficiency of the preceding year, together with· the estimated expenses of such ensuing year." We do not regard it as of special importance, as relates to the question now before us, that this power and duty of the legislature are expressed in the constitution; for, had they not been expressed, they would, in the absence of words excluding the implication, have been implied. But the section was there when the bonds were issued; and, in respect to the power and duty on the part of the legislature thus expressed, counsel for the respondents argue that among the expenses which the legislature was thus directed to provide for, was the annually-accruing interest, and ultimately the principal, of these bonds; but, as the state had no other reliable source of income except through taxation, the parties—the state and the receivers of the bonds—must have looked to and intended taxation as directed by the constitution, to wit, through the legislature, as the means through which the interest and principal of the bonds were to be paid; that is, that it amounted to a contract that the legislature should provide by taxation to pay the bonds, and that such contract is as unimpairable by the state as the contracts, in the cases

v.29—35

we have cited, that the municipalities should provide by taxation for payment of the debts incurred by them. Or, if that is not the case, then that taxation by the legislature was at that time provided in the constitution as the remedy, or as the principal and only reliable remedy, for creditors of the state, including holders of these bonds. We endeavor to state, though not in their language, the substance of their propositions. At the time the bonds were issued, the power to tax was in the legislature. Had it remained in that body, there can be no question of its duty to tax, unless there were other means to punctually pay the obligations of the state.

Was it a contract that this power and duty should remain in the legislature? The decision of this question involves the same consideration as is involved in the question, whether, treating the power and duty then in the legislature as a then-existing remedy for the bondholders, taking it away or changing it, as provided in the amendment of 1860, lessens the value of the obligation to pay the sums stipulated in the bonds. For, no agreement to leave with the legislature the power and duty to provide for payment of the bonds being expressed, it would not be implied, unless essential to the better fulfillment of the contract on the part of the state. It would not be implied, if it might be regarded as indifferent to the bondholders whether the power and duty remained in the ordinary legislative department of the state, or was vested elsewhere; and, regarding it only as a remedy, there would be no legal objection to the state taking it away, providing it substituted an equally effectual one in its stead; for it is the substance and effectiveness, and not the mere forms of remedies, which must be preserved.

Though the obligation of the contract is distinct from the remedy to enforce it, and the two ought not to be confounded, yet they are so nearly connected that a law lessening the force of the remedy must necessarily affect the value of the obligation. The inhibition of the federal constitution being absolute, it operates to prevent any attempt, either direct, against the contract, or indirect, against the remedy, to impair the obligation of contracts. A law affecting the remedy, if it lessen the value of the obligation, is equally void with one which does so by operating directly on the contract. "One of the

tests that a contract has been impaired is that its value has, by legislation, been diminished. This is not a question of degree, or manner, or cause, but of encroaching in any respect on its obligation." *Planters' Bank* v. *Sharp*, 6 How. 301, 327. So that, in considering each proposition on behalf of the respondents, we are brought directly to consider the natural effect, as to these contracts, of the amendment, in removing the power and duty from the legislature, and remitting it to the electors at large in the state, to be exercised at a popular election.

If the natural effect of so removing the power and duty from the legislature would be to render the payment of the bonds less certain than if the legislature should retain the power to provide for such payment, then it may safely be implied that such removal would be contrary to the then intentions of the parties, the state and the receivers of the bonds; and it is also clear that it impaired the obligation of the contracts by taking away a then-existing remedy, without giving an equally efficient one instead. We are relieved in this case from any necessity to consider how far a state may go, and to what extent remedies may be rendered less speedy or convenient, when, upon considerations of public policy and expediency, and consulting the general public good, it changes its laws or its constitution, or mode of administering its government. The power to make such changes from such motives, even though they incidentally affect existing contracts of the state or individuals, may be conceded. But any supposed advantage to the state of repudiating its debts, or of obstructing its creditors in respect to their payment, can never be admitted as a consideration of public policy or expediency, or of good to the public, which will justify a change. If it might, it would apply equally to all state contracts, executory or executed, and indeed to all contracts between individuals, and the clause in the federal constitution could thus be successfully evaded. It is apparent, upon the face of this amendment, that the only motive operating in its adoption was the intent to affect these bonds. If the effect of the amendment was to prevent or postpone or obstruct their payment, that, and no consideration of general public policy, was the motive of its adoption. It must, therefore, stand or fall, according as it af-

fects injuriously or not the contracts mentioned in it. And it can get no aid from any right of a state to change its laws or the mode of administering its government. That it was intended as a check upon the payment of the bonds—not merely as a restraint upon payment before they should fall due, but upon payment at all—cannot be questioned. Else, why disable the ordinary legislative department to provide in any way for their payment, while full legislative authority was left to it with respect to every other obligation of the state? All legislative power over the matter of their payment was stripped from the legislature. The mere power to propose for the electors to adopt or reject a law providing for their payment is not legislative. It might be as well entrusted to the executive. That it had the effect intended, to check and obstruct payment, has passed into the history of the state. That such was its natural, indeed its inevitable, result, we think no one could deny. It was because such would be the natural effect of it that it was adopted.

The idea of remedy in the hands of any one but the aggrieved party implies the right to make application to the body or person in whose power the remedy is, to set it in motion. Thus, judicial remedy necessarily includes the right to apply to a court, and show reasons why the remedy should be made available. And a legislative remedy, or one within the power of the legislature, includes the right in the party entitled to it to present his case to that body, and demand its action in his behalf. It requires no argument to show that such a right is of value, for the application of the remedy may depend upon it. To take away the right, or, what would be the same in affect, to deprive him of an opportunity to exercise it, would certainly affect seriously the value and efficiency of his remedy.

It may be assumed that, with the same opportunity in the bondholders to fully present their claims to the people, and in the people to properly investigate, deliberate upon, and decide the justice of the claims, the people would grant the relief to which the holders were entitled as readily as the legislature would. When the bonds were issued, the holders had a right to apply for relief to the legislature, and there was no difficulty in the way of exercising the right. The legislature is small in numbers, select, its members supposed to be

chosen for their intelligence, integrity, and ability to deal with questions coming before such a body; deliberative, its proceedings conducted according to established rules; responsible, for every member is sworn to do his duty, and must answer to his constituents for the manner in which he performs it; acting openly, so that every one may know how each member performs his duty; having stated times and a stated place for meeting, so that every man may know when and where it is to be found together; with power to send for persons and papers, to take evidence and ascertain facts, resembling that possessed by a court of justice; and having the opportunity, when all assembled, to hear arguments, to deliberate, and reason together of what the state ought in right to do in any case before them. But the people are dispersed throughout the state; they can never be brought together to act as a deliberative body. They investigate, reach conclusions, and act by no established rules, each individual being in those matters a law unto himself, and for his action responsible to no one, and each voting by secret ballot. They are unable to resort to the methods pertaining to a court or legislature to ascertain the facts, and unable to reason together as a body upon any claim against the state. An opportunity to present to the people a claim against the state, and apply to them for relief, in fact does not and cannot exist, and the right to do so is a mere shadow; for all that any one can do is to present his case, and apply for relief, to such separate individuals of the people as he may be able to reach. The right of the bondholders to apply for recognition of their claims and for redress, so far as it was an available and efficacious right, was practically taken away. The value and efficiency of the remedy was thus lessened. Suppose, when the bonds were issued, it had been expressed in the constitution, and repeated in the bonds, that no law levying a tax, or making other provision for the payment of their interest or principal, should take effect until submitted to and adopted by the people in a popular election, can any one believe that they would have been of equal value in the financial markets with bonds, the power and duty to provide for paying which was in the legislature? The amendment necessarily diminished the value of the bonds by rendering their payment less certain.

We conclude, therefore, that it may be regarded as entering into the contract that the power and duty vested in and imposed upon the legislature, at the time the bonds were issued, to provide by taxation or otherwise for their payment, should continue and be exercised; and also that such power and duty in the legislature was a remedy which could not be taken away without providing another equally efficient. The amendment of November 6, 1860, taking away the power of the legislature to provide for payment of the bonds, is in violation of this contract and lessens the efficiency of the remedy. It is, therefore, repugnant to the constitution of the United States, and void. Being void, it cannot affect the validity of the act of March 2, 1881; for it is still in the power, and is still the duty, of the legislature to provide for payment of the bonds.

The objection that the act of March 2, 1881, attempts to delegate legislative power, requires a reference to several sections of the act to ascertain what is referred to the judges to decide, what effect is given to their decision, and what is made to depend upon their decision.

Section 2 constitutes the judges of the supreme court a tribunal (the places of those judges disqualified or declining to act to be filled, as provided in section 8, by the governor appointing judges of the district courts) to hear, consider, and determine the matters submitted to them by the act. Section 2 provides: "Said judges shall hear arguments, determine and decide whether the legislature has power to provide for the payment, adjustment, or settlement of the liability of the state on said Minnesota state railroad bonds without submitting the matter to a vote of the electors of the state, notwithstanding the amendment to section 2, article 9, of the constitution, adopted November 6, 1860." It appoints a time and place for them to meet, and for filing their decision with the clerk of the supreme court. Section 4 provides that the clerk of the court, as soon as the decision shall be filed with him, shall prepare and file with the state auditor a certified copy of such decision, and it proceeds: "If the decision be against the validity of such constitutional amendment, or that the legislature has power to provide for the settlement of said bonds without submission to the people, then it shall be the duty of

the governor and auditor of state to cause to be prepared new bonds of the state, which new bonds shall be styled 'Minnesota State Railroad Adjustment Bonds,'" the new bonds to be exchanged for the old ones. Section 5 provides: "In case the decision of the tribunal to whom the validity of said constutional amendment shall be submitted under the provisions of this act shall be in favor of the validity of such amendment, and that the legislature has not power to provide for the adjustment of said bonds without submission to the people, then this act shall be submitted to the electors of the State of Minnesota at the next general election to be held therein after the filing of said decision; and, within sixty days after said election, if said act shall be adopted by a majority of said electors present and voting thereon, the same proceedings shall be had for the settlement and adjustment of said Minnesota state railroad bonds as hereinbefore provided for in case of a decision by the court holding said amendment invalid."

It then provides the mode for submitting it to the people, and of voting on it. Section 6 provides for the tribunal computing and reporting the amount due on certain judgments, and the payment by the state in the new bonds, or in money, of fifty per cent. of such amount. Section 7 provides for the tribunal ascertaining and reporting upon claims for work, labor, or services performed, or for provisions, boarding of contractors, workmen, or others, or for material or supplies of any kind furnished and actually used in the location and construction of either or any part of the lines of railroad of the land-grant railroad companies which received said state railroad bonds from the state, which occurred prior to the time when the state acquired and transferred said lines of railroad, and for the payment, within a stated aggregate amount, of fifty per cent. of such claims in money or the new bonds. Section 9 establishes a fund for the payment of the interest on the new bonds.

It is a principle not questioned that, except where authorized by the constitution, as in respect to municipalities, the legislature cannot delegate legislative power; cannot confer on any body or person the power to determine what shall be the law. The legislature only must determine what it shall be. The courts only must authorita-

tively determine what it is.   If this act leaves it to be determined by
the judges that the act, or any part of it, shall take effect and become
law, then it is a violation of the principle we have stated, and is void;
and it does not matter that the act does not profess in terms to confer
this power on the judges, if it gives it in substance and effect.   It re-
quires only an analysis of this act to make the conclusion inevitable
that, whether the act is to have any practical operation at all, is, in
substance, left for the judges to say.   If they do not act at all—if
they express no opinion upon the validity of the constitutional amend-
ment—then neither section 4 nor section 5 is to take effect as law.
If they conclude that the amendment is invalid, then section 4 is to
be the law, and section 5 is not; but if they arrive at a contrary con-
clusion, section 5 is to be the law and section 4 is not.   To put the
statement in a different form, section 4 is to go into effect, to become
a law, to establish a rule for the action of the governor and auditor,
and create duties for them to perform, provided the judges are of the
opinion that the legislature has authority to enact that section, other-
wise not; and if they are of opinion that the legislature has no author-
ity to enact section 4, then section 5 is to go into effect.   As a law
must rest upon the authority of the legislature to enact it, both of these
sections cannot be law.   If the constitutional amendment be valid,
then the legislature could not make section 4 law.   If it be invalid,
the legislature could not make section 5 law.   And the act does not
assume to determine which of the two shall be law, but leaves it in
substance, if not in form, to be determined by the judges.   In enact-
ing a law the legislature must pass on two things—*First*, on its au-
thority to make the enactment; *second*, on the expediency of the en-
actment.   It cannot refer either of these questions to the decision of
any one else, so that the enactment shall or shall not take effect as
law according as such decision shall be.   If, by the terms of an act,
it was to take effect and be operative only in case A. or B. should
think the act expedient, surely no one would claim it to be valid.   To
make it take effect and be operative only in case A. or B. should
think the legislature had authority to pass it, would equally vitiate it.

It is not questioned that within certain limits the operation of a
legislative act may be made to depend on a future contingency; upon

the happening of some event or the arising of some condition of things. Very many laws are of that character. But in all such cases the legislature determines upon its authority to pass the law, and that if the specified event shall happen, or the condition of things described shall arise, it will be expedient that the act shall have the operation provided for such event or condition of things. But no one before ever thought that the expression of a non-judicial opinion on the authority of the legislature to pass an act, could be regarded as a future contingency upon which the effect of the act as law could be made to depend. We doubt if any other such law as this was ever passed. We regard the act as not only bad in principle, but dangerous as a precedent. If the legislature may submit to others this provision in the constitution as affecting its legislative authority, and make the taking effect of laws depend on the decision, it may in like manner refer any other constitutional provision; and as there is nothing to restrain the legislature in its choice of the persons to whose decision it will refer such matters, it may make the reference to any person or persons, without regard to their fitness or qualifications to determine the questions submitted. The fact that their choice happened to fall upon five persons who are judges, inasmuch as the submission is not made to them as a court, and in a judicial manner, cannot affect the right to submit. The selection and reference would be as valid had it fallen upon any other five men. The evils which might grow out of a power in the legislature to thus evade the responsibility of determining its authority to pass laws or the expediency of passing them—to shift such responsibility to any one it might choose to designate—must be apparent. The act delegates to the judges the power to determine what provisions in it shall be law—a power which the legislature itself must exercise and cannot delegate. It is therefore void. The provisions of sections 6 and 7 of the act do not affect its validity. There can be no doubt that the legislature may, with the consent of the other party, submit any controversy growing out of the business transactions of the state to arbitration, to the same extent that private persons may; or that, if the state proposes a benefaction or gratuity, the legislature may make it depend on the result of the inquiry and decision of any commission, board,

.or officer it may designate.    So far as those provisions in the act are concerned, the case comes within the decision in *Western R. Co.* v. *De Graff*, 27 Minn. 1.    These sections, however, cannot take effect, for the whole act must fall because of its delegation of legislative authority.

While some of the members of the court do not entirely agree with some of the reasoning in the opinion, yet they all concur in these conclusions, viz.: *First*, that the constitutional amendment of November 6, 1860, providing that "no law levying a tax or making other provision for the payment of interest or principal of the bonds denominated ‘Minnesota state railroad bonds’ shall take effect or be in force until such law shall have been submitted to a vote of the people, and adopted by a majority of the electors of the state voting on the same," is invalid, for the reason that it impairs the obligation of those bonds; *second*, that the act of March 2, 1881, is unconstitutional and void, because it delegates legislative power to the tribunal created by it; *third*, that a writ of prohibition should issue.

Let the writ of prohibition absolute issue, and be served by any elector of the state on or before the 18th day of September, 1881.